UNITED STATES of America,
Appellee,

v.

Robert Kenneth RICH, Appellant.

UNITED STATES of America,
Appellee,

v.

Larry J. WEBER, Appellant.

Nos. 74–1861, 75–1006.

United States Court of Appeals,
Eighth Circuit.

Submitted May 15, 1975.

Decided June 25, 1975.

Rehearing and Rehearing En Banc
Denied July 16, 1975.

James R. Wyrsch, Kansas City, Mo., for appellant Larry J. Weber.

James C. England, Asst. U. S. Atty., Kansas City, Mo., for appellee.

Before LAY and HENLEY, Circuit Judges, and REGAN, District Judge.[*]

HENLEY, Circuit Judge.

The defendants, Robert Kenneth Rich and Larry J. Weber, appeal from judgments of conviction entered following their conviction by a jury for conspiracy to manufacture and distribute a controlled substance in violation of 21 U.S.C. § 846.[1] Each defendant was sentenced to three years imprisonment to be followed by a two year special parole term under 21 U.S.C. § 841(b)(1)(B).

The primary issue on appeal is whether the district court[2] erred in admitting into evidence certain tape recordings of telephone conversations and in allowing the jury to read transcripts of these conversations. We affirm.

I.

Defendants Rich and Weber were charged along with seven other individuals in a single count indictment with conspiracy to manufacture controlled substances, to-wit: methamphetamine and 3, 4—methyledenioxy amphetamine (MDA). Severance was granted to those defendants who indicated that they would testify at trial. The remaining four defendants were tried jointly, and on August 15, 1974 the jury convicted Rich and Weber and acquitted the other two defendants.

The indictment alleged that the nine original defendants committed at least

Robert G. Duncan, Kansas City, Mo., for appellant Robert Kenneth Rich.

[*] John K. Regan, United States District Court for the Eastern District of Missouri, sitting by designation.

1. 21 U.S.C. § 846 states:

Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

21 U.S.C. § 841(a)(1) provides:

(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense, a controlled substance

. . . . .

2. The Honorable Elmo B. Hunter, United States District Judge for the Western District of Missouri.

sixteen overt acts between July 26, 1973 and January 14, 1974 in furtherance of the conspiracy. Evidence introduced by the government showed that defendants Rich and Weber engaged in numerous acts from which the jury could have inferred an agreement to manufacture illicit drugs. The government proved that Weber's girl friend, Cynthia Shinkle, placed eleven large orders to chemical companies for laboratory equipment and chemicals between July 26, 1973 and January 14, 1974. Shinkle and Weber lived together on a farm near Columbia, Missouri. The government connected defendant Rich with the alleged conspiracy by showing that Rich and Weber had been observed on January 21, 1974 transporting chemical containers from Rich's farmhouse in Fulton, Missouri into Columbia, Missouri, and that Rich had traveled to Chicago, Illinois on January 29, 1974 to inspect the contents of several boxes containing chemicals and chemical apparatus which had been ordered by someone using a telephone listed in Shinkle's name. Eventually federal agents seized these boxes at a warehouse and discovered that they had been stored on April 1, 1974 in care of Rich. Discarded chemical containers were observed at both Rich's and Weber's farms and a strong chemical odor was detected at Rich's premises. On April 4, 1974 defendant Weber sold a quantity of phenyl–2–propanone, an essential ingredient of MDA, to a Mr. Larry Walsh.

At this time Mr. Walsh was a "cooperating individual" who had agreed to assist the government in its investigation in exchange for a promise of immunity from prosecution for his past drug violations. Besides purchasing the P–2–P from Weber, Walsh agreed in mid-March to permit the government to record his telephone conversations with some of the original nine defendants. Between March 21, 1974 and April 4, 1974, the government recorded ten such telephone conversations. These recordings were made by attaching a telephone induction coil to the receiver of the telephone and connecting a cassette tape recorder to the induction coil. All but one recording were made by Walsh making or receiving calls at the Drug Enforcement Administration headquarters at Kansas City, Missouri. Before each conversation, federal agents would secure Walsh's consent to record the conversation. During each conversation, Walsh sat beside two agents who operated the recording equipment. Only an April 3, 1974 call from Weber to Walsh at Walsh's residence was recorded outside the presence of federal agents. Transcripts were made of these recordings.

The recordings implicated not only the declarants but also other individuals alleged to have been co-conspirators, including Rich and Weber. In many instances, Rich and Weber were parties to these conversations with Walsh.

The government also recorded a conversation between Walsh and Weber through the use of a "Kel-Com" transmitter attached to Walsh's body. During this conversation on April 4, 1974 Weber sold the P–2–P to Walsh. The recording was almost inaudible and so no transcript was shown to the jury. Later that day, the grand jury returned an indictment and both Rich and Weber were arrested on April 5, 1974.

## II.

The defendants first argue that these recordings should not have been admitted into evidence because the conversations were not made during and in furtherance of the alleged conspiracy. The defendants contend that the conspiracy to manufacture drugs, if any, terminated in late January, 1974. The government contends that while the laboratory had been dismantled in January, the defendants merely secreted their laboratory equipment and fully intended to resume active manufacture as soon as a pending grand jury investigation had been completed. Thus, the government claims that the conspiracy lasted until the time of the defendants' arrest on April 5, 1974.

■ It is axiomatic that hearsay statements made by a conspirator out of the presence of the other co-conspirators may be used against not only the declarant but also against his co-conspirators. *United States v. Overshon*, 494 F.2d 894, 898 (8th Cir.), *cert. denied*, 419 U.S. 853, 95 S.Ct. 96, 42 L.Ed.2d 85 (1974). However, such statements may be considered by a jury only if it finds from independent evidence beyond a reasonable doubt that (1) a conspiracy existed; (2) the person making the statement and the defendant against whom the statement is used were members of the conspiracy; and (3) the statement was made during and in furtherance of the conspiracy. *United States v. Jimenez*, 496 F.2d 288, 291 (5th Cir. 1974); *United States v. Pennett*, 496 F.2d 293, 296 (10th Cir. 1974). As used in this context, the term "conspiracy" means an agreement between two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.[3]

■■ In reviewing a jury finding of guilt in a criminal case, an appellate court is required to view the evidence in the light most favorable to the government and to accept as established all reasonable inferences to support the conviction. *United States v. Cummings*, 507 F.2d 324, 329 (8th Cir. 1974); *United States v. Gaskill*, 491 F.2d 981, 982 (8th Cir. 1974). Applying this standard, we find that the jury reasonably could have found from the independent evidence that a conspiracy to manufacture illicit drugs was formed in 1973 between defendants Rich and Weber and the other declarants in the telephone conversations. The jury also could have concluded that this conspiracy continued into April, 1974 and that active manufacturing had been suspended only temporarily until the grand jury investigation cooled off. Thus, the recorded conversations would have been made during the existence and "in furtherance" of the conspiracy and could have been considered by the jury in deciding whether any one of the conspirators took an overt act in furtherance of the conspiracy.

Several commentators have noted that courts have tended to broadly construe the requirement that the co-conspirator's statement be made in furtherance of the conspiracy, so long as the hearsay statement sought to be admitted was uttered during the active life of the conspiracy under circumstances indicating reliability and provided the statement related to the conspiracy itself.

*United States v. Overshon, supra,* at 899.

■ While the most damaging statements were made by Weber and Rich themselves, two other original defendants made statements which incriminated Weber and Rich. These statements were properly admitted into evidence as substantial independent evidence existed that the declarants were also part of the conspiracy with Rich and Weber. Whether the jury actually considered these statements against Weber and Rich is of no consequence on appeal since the trial judge properly instructed the jury concerning the circumstances in which the statements could be considered as to the defendants.

### III.

■ Secondly, the defendants claim that the telephone and Kel-Com recordings were admitted into evidence in violation of their Fourth Amendment rights. This argument was rejected recently in *United States v. McMillan*, 508 F.2d 101 (8th Cir. 1974), and we perceive of no reason to overrule that precedent as urged by defendants. The

---

3. However, in order to be convicted of the crime of "conspiracy," the government must show by evidence beyond a reasonable doubt that one or more of the conspirators committed an overt act in furtherance of the conspiracy. *Cave v. United States*, 390 F.2d 58, 68 (8th Cir.), *cert. denied,* 392 U.S. 906, 88 S.Ct. 2059, 10 L.Ed.2d 1365 (1968). Thus, the incriminating statements of one conspirator can be used against a co-conspirator to prove that either conspirator committed an overt act in furtherance of the conspiracy.

government does not engage in a "search" within the meaning of the Fourth Amendment when the defendants' telephone conversations with an informant are electronically monitored by a government agent with the "consent" of the informant. *Id.* at 104. The same rule applies when the government monitors conversations by use of a transmitter with the consent of one of the parties to the conversation. *United States v. White,* 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (plurality opinion); *United States v. Lippman,* 492 F.2d 314, 318 (6th Cir. 1974), *cert. denied,* 419 U.S. 1107, 95 S.Ct. 779, 42 L.Ed.2d 803 (1975); *United States v. Dowdy,* 479 F.2d 213, 229 (4th Cir.), *cert. denied,* 414 U.S. 823, 94 S.Ct. 124, 38 L.Ed.2d 56 (1973).

■ The fact that Walsh became a government informant in exchange for a promise of immunity from prosecution in no way diminishes the voluntariness of his "consent" to the monitoring of his conversations with the defendants and the other alleged conspirators. *United States v. Dowdy, supra,* at 229; *see United States v. Bonanno,* 487 F.2d 654, 658–59 (2d Cir. 1973).

### IV.

■ The defendants further allege that interception and recording of their telephone conversations is prohibited by Title III of the 1968 Omnibus Crime Control Act, 18 U.S.C. § 2510 *et seq.* However, 18 U.S.C. § 2511(c) specifically authorizes the type of interception at issue:

> It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

Drug Enforcement Administration agents clearly were acting "under color of law" when they recorded Walsh's conversations. The only instance where federal agents failed to directly supervise the recording of a telephone conversation was when Walsh recorded a call from Weber received at Walsh's residence. Nevertheless, Walsh was acting at the direction of government investigators, and in the limited circumstances of this case we believe that this particular conversation was recorded by a person "acting under color of law."

■ The defendants' remaining contention that the monitoring in question violated state and federal tariff regulations because no bleeper device was attached to the telephone is frivolous as those tariffs on their face apply only to persons acting in their private capacities.

### V.

An arrest warrant was issued for defendant Weber and his girl friend, Cynthia Shinkle, following the return of the grand jury indictment on April 4, 1974. At that time, Weber and Shinkle were living together at a farmhouse located in Boone County, Missouri. At approximately 11:20 a.m. on April 5, 1974, five federal and state officers arrived at the farmhouse to execute the warrants. They noticed three cars parked outside the house. The officers split up with two agents going to the rear door and the other agents going to the front door. After announcing their identity and purpose and having received no response, the officers entered through both doors. After finding two unidentified individuals asleep in the living room, the officers moved throughout the house to ascertain whether Weber and Shinkle were present. While so doing, they observed some drug paraphernalia and chemical apparatus. Weber and Shinkle were eventually located in a bedroom. Shinkle was informed that her car was being seized pursuant to 21 U.S.C. § 881(a)(4) and that she could remove her personal possessions from the automobile. En route to pick up these items, she requested permission to pass through the garage since it was the most direct route to the car. While passing through the garage, the officers noticed several containers of chemicals in plain view. At trial the officers testified as to what they observed in plain view while executing the

arrest warrants and while escorting Shinkle through the garage. However, none of the items observed was introduced into evidence.

 The defendants' contention that the search of the farmhouse was unreasonable must fail. In executing these arrest warrants, the agents were entitled to make a quick and cursory search of the house for other occupants since they had observed three cars parked outside and had found only two persons asleep in the living room. *United States v. Blake*, 484 F.2d 50, 57 (8th Cir. 1973), *cert. denied,* 417 U.S. 949, 94 S.Ct. 3076, 41 L.Ed.2d 669 (1974); *United States v. Briddle*, 436 F.2d 4, 7 (8th Cir. 1970), *cert. denied,* 401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 824 (1971). Since the agents had a right to conduct a security check throughout the entire house, they could testify as to what they saw in plain view. *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).

 It is clear from the evidence that officers had probable cause to believe that Shinkle's car had been used to facilitate the transportation of controlled substances or equipment used to manufacture controlled substances. Thus, they could immediately seize her car pursuant to 21 U.S.C. § 881(b)(1). Accordingly, they acted reasonably in escorting Shinkle at her request through the garage and could testify to what they saw in plain view while doing so. *O'Reilly v. United States*, 486 F.2d 208, 210 (8th Cir.), *cert. denied,* 414 U.S. 1043, 94 S.Ct. 546, 38 L.Ed.2d 334 (1973).

## VI.

The defendants claim that the district court erred in failing to quash the indictment on the grounds that the indictment (1) charged three separate crimes in one count; (2) contained several typographi-

cal errors; and (3) failed to state the schedule of each controlled substance the defendants allegedly conspired to manufacture.

 A review of the record convinces us that the defendants were in no way prejudiced by these alleged errors. An indictment will not be dismissed because of spelling errors unless the defendant can affirmatively show that some prejudice resulted. Failure to list the schedule of each controlled substance has no bearing on whether the indictment states an offense against the United States. Assuming that the substances mentioned are controlled substances, the schedule into which the controlled substance is classified is not relevant to the offense itself but only to the sentence that can be imposed. Finally, the record clearly shows that the jury was instructed only on the charge of conspiracy to manufacture a controlled substance and that sentence was imposed on only this charge. Thus, defendants cannot contend that they were prejudiced because the indictment was allegedly duplicitous.

## VII.

 The defendants' last major contention is that the special parole statute, 21 U.S.C. § 841(b)(1)(B), is unconstitutionally vague since it does not delineate the maximum limit of the special parole term and does not specify the conditions of parole.[4] We are unconvinced that fundamental fairness is violated when a convicted felon is not told in advance of his release from prison the conditions of his parole. *United States v. Simpson*, 481 F.2d 582, 585 (5th Cir.), *cert. denied,* 414 U.S. 1095, 94 S.Ct. 728, 38 L.Ed.2d 553 (1973). Indeed, it is frequently impossible to ascertain before completion of the period of imprisonment what conditions will be suitable for parole.

---

**4.** 21 U.S.C. § 841(b)(1)(B) provides in pertinent part:

. . . Any sentence imposing a term of imprisonment under this paragraph shall, in the absence of such a prior conviction, impose a special parole term of at least 2 years

in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a special parole term of at least 4 years in addition to such term of imprisonment.

The special parole statute in question provides for a minimum parole term of two years following imprisonment but does not specify the maximum term of parole which can be imposed. The courts interpreted the Lindbergh Act, Ch. 271, §§ 1, 3, 47 Stat. 326, as setting a maximum sentence of life although the Act explicitly permitted the court to sentence the kidnapper "in its discretion." *Bates v. Johnston,* 111 F.2d 966 (9th Cir.), *cert. denied,* 311 U.S. 646, 61 S.Ct. 17, 85 L.Ed. 412 (1940); *Bailey v. United States,* 74 F.2d 451, 452 (10th Cir. 1934). Similarly, we read the special parole statute in question as providing a maximum term of parole of life. Due process is not violated by failure of a sentencing statute to specify the maximum sentence of imprisonment or parole. *Earin v. Beto,* 453 F.2d 376 (5th Cir.), *cert. denied,* 406 U.S. 909, 92 S.Ct. 1618, 31 L.Ed.2d 819 (1972).

We have considered defendants' other assignments and find no prejudicial error.

Affirmed.