**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Frank Alexander SIMMONS, Defendant-Appellant.**

**No. 77–1271.**

United States Court of Appeals, Seventh Circuit.

Argued June 16, 1977.

Decided Oct. 31, 1977.

315

Paul Bradley, Chicago, Ill., for defendant-appellant.

Samuel K. Skinner, U. S. Atty., Terry A. Zitek, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT and WOOD, Circuit Judges, and CAMPBELL, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

Defendant appeals his conviction following a trial by jury on charges of armed bank robbery in violation of 18 U.S.C. § 2113(a) and § 2113(d).[1] It appears from the evidence adduced at the hearing on defendant's motion to suppress and the trial that on February 9, 1976, the Allied Savings and Loan Association located in Chicago, Illinois, was robbed of about $16,000 by two men wearing ski masks and carrying handguns. Immediately after the robbery, a citizen observed the two robbers in an automobile a short distance from the bank, called the police, related the license number of the car and gave a physical description of the men. Utilizing the license number, the police determined that the automobile observed near the scene of the robbery was registered to Frank Pastore. The police proceeded to Pastore's apartment, arrested him, recovered approximately $8,000 and seized a .38 caliber revolver. Pastore implicated defendant as his accomplice in the robbery, and based on the information from Pastore the police traced the defendant to the Devon Hotel. Following the questioning of Pastore, about ten policemen and FBI agents proceeded to the Devon Hotel to find and arrest defendant. Upon determining which room was occupied by defendant, several officers knocked on the door while others waited in various positions throughout the hallway. After giving several aliases, defendant finally admitted his true identity and opened the door. Almost immediately defendant was arrested, handcuffed, and removed from the room.

The district court, in ruling on defendant's Motion to Suppress after an evidentiary hearing, made certain findings of fact. The court found that simultaneously with defendant's arrest by the officers, two other police officers, Grant and Trotta, entered the hotel room. That room, which was almost entirely visible from the hallway, was very small, approximately ten feet by twelve feet, and afforded little space for movement. Upon entry into a very short hallway, Officers Grant and Trotta observed a naked woman in the room standing about two to three feet from the bed. Officer Trotta reached for something to cover the woman. Officer Grant at the same time observed a bulge on the bed which he uncovered and found to be a bag containing $1,260 in United States currency. Officer Grant also observed a purse close by the bed and within reach of the woman. He emptied the contents of the purse onto the bed and discovered a gun which subsequently proved to be a replica. Both the currency and the replica gun were seized by the officers. No warrant had been issued for this search.

After being taken into custody but prior to his removal from the hotel, defendant

---

* The Honorable William J. Campbell, United States Senior District Judge for the Northern District of Illinois, is sitting by designation.

1. 18 U.S.C. §§ 2113(a) and (d) provide as follows:

 (a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or

 Whoever enters or attempts to enter any bank, credit union, or any savings and loan association, or any building used in whole or in part as a bank, credit union, or as a savings and loan association, with intent to commit in such bank, credit union, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank or such savings and loan association and in violation of any statute of the United States, or any larceny—

 Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.

 (d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined not more than $10,000 or imprisoned not more than twenty-five years, or both.

stated in the presence of an FBI agent and several police officers, "I guess this is that robbery that Frank and I were involved in." In response to questioning by the agents and officers, defendant also admitted at that time that he had received $2,300 from the Allied Savings and Loan robbery. Defendant made further incriminating statements to the police officers while traveling by car from the hotel to police headquarters.

Prior to trial defendant, although conceding that there was probable cause for his arrest, moved to suppress the items seized at the hotel as well as the statements which he had made after his arrest. At the suppression hearing, both Officer Grant and Officer Trotta testified that at the time of the search they were concerned with their own safety. Officer Grant stated that he was searching for the gun and the money, and also stated that he was not paying any real attention to the woman in the room. He further testified that his purpose in searching for the weapon was to avoid the possibility of its use against him. The district court found that both officers were searching for evidence and for any weapons that could be used against them. The court concluded that considering all the circumstances of the case and the fact that a third party was in the room, the search of the bed and the purse was incident to defendant's arrest and did not constitute an unreasonable search and seizure under the Fourth Amendment.

With respect to the statements made by defendant after his arrest, the district court also heard testimony from the agents and officers present when the statements were made. As the Government conceded that the warnings given to defendant were inadequate under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the court ordered them suppressed as to the Government's case-in-chief. The court further found, however, that the statements were not made involuntarily and thus ruled that they could be used for purposes of impeachment.

Three issues are to be resolved.

## I. Suppression of the Physical Evidence.

Relying primarily upon *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), defendant argues that the search by Officer Grant was unreasonable under the Fourth Amendment and that the court erred in failing to suppress both the gun and the currency seized from defendant's hotel room. In *Chimel, supra,* the Court defined the principles under which a warrantless search incident to an arrest is permissible:

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence. (*Supra,* at 762–63, 89 S.Ct. at 2040.)

The existence of "potential dangers lurking in all custodial arrests" eliminates the necessity of probable cause to believe that the arrestee is in possession of a weapon or is about to destroy evidence. *United States v. Chadwick,* 433 U.S. 1, 14, 97 S.Ct. 2476, 53 L.Ed.2d 538. Moreover, warrantless searches have been sustained under the *Chimel* rationale where the item searched was in close proximity but not strictly in the immediate possession of the arrestee.

See e. g., *United States v. French,* 545 F.2d 1021 (5th Cir. 1977); *United States v. Frick,* 490 F.2d 666 (5th Cir. 1973), *cert. denied,* 419 U.S. 831, 95 S.Ct. 55, 42 L.Ed.2d 57 (1974). Where, however, law enforcement officers had reduced personal property not associated with the person to their exclusive control, thereby eliminating the potential dangers inherent in allowing its access to defendant, the search was no longer incident to the arrest and, absent other exigent circumstances, a warrant was required. *Chadwick, supra,* 433 U.S. at 15, 97 S.Ct. 2476; see also *United States v. Berry,* 560 F.2d 861 (7th Cir. 1977).[2]

■■■ The thrust of defendant's argument is that the testimony of Officer Grant that he was not paying any real attention to the woman in the room indicates that he did not fear any danger that she might reach for a weapon. This testimony, defendant submits, is contrary to the district court's finding that he was searching for weapons. We do not agree with defendant that Officer Grant's testimony reflects that he did not sense a potentially dangerous situation due to the woman's presence. A rational division of assignment among various police officers does not imply that those officers not directly assigned to controlling the movement of a person may not legitimately fear the possibility of dangerous activity by a person found in the company of a person who shortly before had participated in an armed bank robbery. Women are not unknown as accomplices in serious crimes. Even if we consider only the isolated statement by Officer Grant, we need not infer that the officer did not have a legitimate concern about the presence of the armed robber's associate at the scene of the arrest. See *United States v. Tharpe,* 536 F.2d 1098, 1100–1101 (5th Cir. 1976) (en banc). Moreover, there are additional statements by Officer Grant in the record to support the court's findings.[3] We con-

clude that the court's findings regarding the officers' fear and the purpose of the search were not clearly erroneous. *United States v. Reynolds,* 532 F.2d 1150, 1156 (7th Cir. 1976); *United States v. Griffin,* 530 F.2d 739, 742 (7th Cir. 1976).

The disposition of the question regarding the officers' concern for their safety does not completely resolve the Fourth Amendment issue now before us. The obvious fact distinguishing this case from *Chimel* is that the search here was of the area within the immediate control of a third person who was not placed under arrest, and not of the area at that moment within the immediate control of the defendant who was arrested, but it had been in the immediate control of both up to the accomplishment of the arrest. Few courts have considered questions surrounding a search of an arrestee's companion, and even in those cases the searches consisted of only a "pat down" as approved in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See e. g., United States v. Berryhill,* 445 F.2d 1189, 1192–93 (9th Cir. 1971); *United States v. Poms,* 484 F.2d 919, 922 (4th Cir. 1973); *United States v. Vigo,* 487 F.2d 295, 298 (2d Cir. 1973); *United States v. Tharpe,* 536 F.2d 1098, 1101 (5th Cir. 1976) (en banc). The Government nonetheless urges us to sanction the search in this case relying upon the reasoning of the court in *Berryhill:*

> We think that *Terry* recognizes and common sense dictates that the legality of such a limited intrusion into a citizen's personal privacy extends to a criminal's companions at the time of arrest. It is inconceivable that a peace officer effecting a lawful arrest of an occupant of a vehicle must expose himself to a shot in the back from defendant's associates because he cannot, on the spot, make the nice distinction between whether the other is a companion in crime or a social

---

2. Defendant does not claim that either the bag containing the money or the purse were in the exclusive control of the officers so as to require a warrant. In any event, those claims would not be supported by the facts.

3. On redirect examination by the Government, Grant testified that in one previous situation where he entered a room, an occupant pulled a revolver out from underneath a sheet and aimed it at Grant's head. Officer Grant shot the occupant at that point.

acquaintance. All companions of the arrestee within the immediate vicinity, capable of accomplishing a harmful assault on the officer, are constitutionally subjected to the cursory "pat-down" reasonably necessary to give assurance that they are unarmed. (*Supra*, at 1193.)

While this rationale may be sufficient where a search is limited to a "pat down," we are unwilling to hold that on this reasoning *Terry* may be generally extended to items within the area of immediate control of an arrestee's companion. See *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). Indeed, the court in *Berryhill* specifically noted that the search of defendant's companion did not extend beyond an examination of a handbag which she was clutching at the time of the arrest. *Berryhill, supra*, at 1193. Our reluctance to rely on the reasoning urged by the Government does not necessarily preclude us from allowing the search in this case. The full search of a person following a lawful custodial arrest is "not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under the Amendment." *United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973). Even an arrestee, however, retains his expectation of privacy in possessions within his immediate control, thus a warrantless search of those items cannot be justified by any reduced expectation of privacy stemming from the arrest. *Chadwick, supra*, 433 U.S. at 16, n. 10, 97 S.Ct. 2476. The justification for allowing warrantless searches of those items within an arrestee's immediate control without requiring the calculation that destruction of evidence or weapons may be involved lies, as we have noted in the "potential dangers lurking in all custodial arrests." *Id.* at 14, 97 S.Ct. at 2485. Persons who are present in the company of the person arrested do not automatically lose some share of their Fourth Amendment protections. *United States v. Di Re*, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948). Thus, although the rights of defendant's companion are not directly in question here, see *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), we should nonetheless be at least cognizant of them in considering the search which involved items within her immediate control. We are unable to assume that in every case the "potential dangers" which accompany a custodial arrest invariably infect the immediate area within the control of a companion so as to render every search of items within the area of a companion's immediate control a reasonable one. A sweeping approval such as that would carry the obvious potential for abuse of both the rights of the arrestee and his companions. Where, however, an arresting officer by his own calculation which must survive objective review, determines that a dangerous situation may exist under the circumstances due to the presence of a third party, we do not propose, out of regard for the safety of the officers, to limit the search to a "pat down" when the actual danger is seen reasonably to exist in easy access to items within the companion's immediate control.

In our view there is little question, therefore, that under this rule the search conducted in these particular circumstances was reasonable. At the time the officers and agents approached defendant's hotel room, they did not know who else might also be occupying the room. While the defendant was being arrested in the doorway in the small room by other officers, Officers Grant and Trotta immediately observed that another person was in the room standing near the bed.[4] The probability that a gun was also in the room was enhanced by the fact that both suspects had been observed brandishing weapons during the robbery a short time before. That only two persons had been observed actually participating in the robbery did not exclude the possibility of an accomplice with interest in retaining the proceeds and avoiding arrest. The likelihood that the third person

---

4. Limited searches of residences have been upheld under similar circumstances. See *United States v. Rich*, 518 F.2d 980, 986 (8th Cir. 1975); *United States v. Smith*, 515 F.2d 1028, 1032–33 (5th Cir. 1975); *Simms v. Reiner*, 419 F.Supp. 468, 472–73 (N.D.Ill.1976).

in the room had access to a gun was heightened when Officer Grant observed a lump in the bed. The discovery that the lump was a bag containing currency did not diminish the likelihood that the purse close to the woman also might contain a weapon. It did contain a replica of a pistol. While Officer Grant did not know precisely why the woman was in the room, under these circumstances the officers' fear that a weapon could well be present in the room and that the woman might use it against them was legitimate and well-supported.[5]

 We do not necessarily advocate by our decision an extension of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), or wholesale searches of areas within the immediate control of all persons present during an arrest. We do, however, hold that a search of items within the area of immediate control of a person who is present during a custodial arrest for a recent crime in which guns were used is reasonable when an objective probability of danger to law enforcement exists under the circumstances.

## II. Defendant's Post-Arrest Statements.

During trial, defendant's counsel informed the court that defendant intended to testify and explain his possession of the money. Defendant's theory was that Pastore robbed the Allied Savings and Loan with another individual and then gave defendant $1,200 to purchase morphine for Pastore. The woman who was found with defendant at the time of his arrest testified regarding defendant's intent to purchase narcotics for Pastore.

Defendant moved *in limine* to prevent the use of his previous incriminating statements for purposes of impeachment on the grounds that he would testify only regard-

ing events occurring after the robbery and would not directly deny participation in the robbery. The trial judge held that if defendant testified he received the money from Pastore, the Government would be entitled to ask on cross-examination, "Isn't it a fact that you received that money in a bank robbery?" The court further provided that if defendant answered in the negative, the Government could impeach his testimony with voluntary prior inconsistent statements made without the benefit of adequate *Miranda* warnings. See *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).[6] After the court's ruling, defendant decided not to testify.

Defendant submits that the trial court's ruling in effect allowed the Government to lay its own foundation for impeachment, a practice condemned by the Supreme Court in *Agnello v. United States*, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1929). In that case, the defendant did not testify on direct examination concerning a can of cocaine which the court had suppressed as the result of an illegal search and seizure. On cross-examination, he testified in response to a question by the Government that he had never seen the can of cocaine. The Government then introduced the cocaine. The Court set aside the conviction, reasoning that the defendant "did nothing to waive his constitutional protection or to justify cross-examination in respect of the evidence claimed to have been obtained by the search." *Agnello, supra*, at 35, 46 S.Ct. at 7.

 We do not agree with defendant that the situation here is controlled by *Agnello*. Defendant's intended testimony would have clearly involved the source of the money which was found in his room. The question the Government would have

---

5. Defendant's companion was not allowed to move about freely and the search was confined to the area within her immediate control. *Cf. United States v. Griffith*, 537 F.2d 900 (7th Cir. 1976).

6. The court in *Harris* held that prior inconsistent voluntary statements obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct.

1602, 16 L.Ed.2d 694 (1966), could be used to impeach a defendant's direct testimony. At 226 of 401 U.S., at 646 of 91 S.Ct. the Court stated, "[t]he shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances."

been permitted to ask and the defendant's prior inconsistent statement both related to the source of the money.[7] It is at least inferable that by responding that he had received the money "from the robbery," defendant meant that he actually participated in it. Defendant asserts that by allowing the Government to ask if defendant received the money "in a bank robbery," the Government could have impeached defendant with statements regarding defendant's participation in the robbery and not merely with statements concerning the money's source. While we do not necessarily agree with defendant's speculation as to the effect of the question as phrased as an example by the court, we think that defendant's prospective testimony was broad enough to open himself up to impeachment with his prior inconsistent statements relating to his receipt of the money from participation in the robbery.

As in *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), we recognize the importance of the *Miranda* protections, but that is not pragmatically to permit them to "be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." For the Government to have been permitted to ask for an explanation of the differences in the defendant's explanations as to the source of the money would have been within the permissible scope of cross-examination.

## III. Prosecutor's Opening Statement.

█ During opening statement, the Assistant United States Attorney made the following remark:

Upon his arrest Mr. Pastore gave a statement to the police concerning the events of that day, his participation in the robbery. And he named his accomplice, and he named Frank Simmons. (Tr. 282). Defendant objected and moved for a mistrial on the ground that the prosecutor's statement referred to inadmissible hearsay. The trial judge denied the motion for mistrial, but immediately and fully instructed the jury to ignore the prosecutor's comment. Later in the trial, following defendant's cross-examination of Pastore, the trial judge ruled that the prior consistent statement of Pastore referred to in the opening statement could then be used to rebut defendant's implied charge that Pastore had falsely implicated defendant solely to terminate his own questioning by police so he could be taken to a hospital for a drug treatment. *See* Federal Rules of Evidence 801(d)(1)(B). While we agree with defendant that the Government's remark during opening statement was improper, we are unable to conclude that it resulted in prejudice to the defendant. In many other cases involving remarks by prosecutors less innocuous than the one in this case, curative instructions have been held sufficient to cure potential defects. See e. g., *United States v. Pritchard*, 458 F.2d 1036, 1041 (7th Cir. 1972) *cert. denied*, 407 U.S. 911, 92 S.Ct. 2434, 32 L.Ed.2d 685. This is especially so where the evidence against the defendant is substantial. See *United States v. Morrow*, 541 F.2d 1229, 1233 (7th Cir. 1976), and cases cited therein. Furthermore, while the Government's opening remark may have played some role in defendant's decision on cross-examination to inquire as to Pastore's motive for implicating defendant and suggesting it was falsified out of Pastore's

---

7. According to the testimony of FBI Agent Travis during the suppression hearing, defendant testified that he received the money from the robbery and not from Pastore to purchase drugs. The actual testimony on direct examination reads as follows:

> A. Well, first of all, we asked him, some members of the Chicago Police Department, not myself, but had asked him where he was at noon on February 9th, his whereabouts, and I don't recall what he said there.

> He was asked if he had any participation in the robbery of the Allied Federal Savings and Loan on the 9th, and additional questions revealed that he was supposed to have received $2,300 from that, and then he directed the questioning to myself and he wanted to know if Frank, he mentioned no other last name, had told us where we could find him.
> Q. And did he say that he received $2,300 from Allied Savings, from the robbery?
> A. I believe that is what he said. (Tr. 66–67).

desire to terminate the questioning and be taken to the hospital for a drug treatment, it was a tactical decision made by the defendant by which he assumed the risk of the Government's rebuttal. The Government was then free, under Rule 801(d)(1)(B) of the Federal Rules of Evidence, to rebut the suggested explanation by using the prior consistent statements made by Pastore shortly after his arrest, and did so without objection by the defendant. What had first seemed to be inadmissible when mentioned during the Government's opening statement, thus later became admissible. No prejudice, therefore, resulted to the defendant.

AFFIRMED.

SWYGERT, Circuit Judge, dissenting.

I am deeply concerned by the majority's ruling on the issue of suppression of physical evidence and must respectfully dissent. By holding that the search conducted in the defendant's hotel room was reasonable, this court has permitted an unwarranted extension of the rules that have evolved under the Fourth Amendment.

The purpose of the Warrant Clause of the Fourth Amendment is to protect individuals from "unreasonable government intrusions into their legitimate expectations of privacy." *United States v. Chadwick*, 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977). Therefore, when confronted by a warrantless search, a court must determine whether the search was reasonable in light of the surrounding circumstances. Because the defendant concedes that the police officers had probable cause to arrest him, the specific question is whether this search was properly conducted incident to an arrest.

It is well established that when a search is conducted incident to an arrest, the officers may search both the arrestee and the area within the arrestee's control in order to remove any weapons and to seize any evidence which might be concealed or destroyed. *Chimel v. California*, 395 U.S. 752, 762, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). However, once a defendant is arrested and under the control of officers, the area of permissible search is narrowed. *United States v. Griffith*, 537 F.2d 900, 904 (7th Cir. 1976). Yet the district court did not use this more limited standard when ruling on the defendant's motion to suppress, despite the fact that the defendant was under control at the time of the search.

Instead, the judge stated that because of the presence of the third party in the room, he found the search of the bed and turning back of the bed covers to be reasonably incident to the arrest. He further found that the search of the handbag and the discovery of the "gun" was "not an unreasonable search and seizure." He so ruled despite the fact that many officers were present, that the third party was a nude woman holding a sheet for cover, and that officer Grant testified he was searching *for evidence*.

In making his determination that the search and seizure was reasonable, the judge used an incorrect standard. In light of all the other factors, the mere presence of the third party alone cannot justify a search of the area within *that* person's control. Only a clear and present danger to the officers could justify such a search. Instead of permitting the woman to dress, posting a guard outside the room, obtaining a warrant and later returning to search the room, the officers chose to proceed immediately by searching the area near this nude woman. To hold such a search was reasonable is to extend the *Chimel* decision beyond permissible constitutional limits.

I therefore would reverse and remand for a new trial.