990 F.2d 861
 61 USLW 2647, 1993-1 Trade Cases P 70,180
 OBRON ATLANTIC CORPORATION, Plaintiff-Appellant,
v.
William BARR, Attorney General of the United States; James
Rill, Assistant Attorney General of the United States; John
Weedon, Chief, and Paul Binder and Edmund Round, Trial
Attorneys, Great Lakes Office of the Department of Justice,
Antitrust Division, Defendants-Appellees.
 No. 92-3294.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 1, 1992.
Decided Feb. 18, 1993.*
 
 Stephen J. Squeri (argued), Charles M. Kennedy, IV (briefed), Jones, Day, Reavis & Pogue, Cleveland, OH, for Obron Atlantic Corp.
 Gregory J. Wallance, Kaye, Scholer, Fierman, Hays & Handler, New York City, Donald S. Scherzer, Kohrman, Jackson & Krantz, Cleveland, OH, for U.S. Bronze Powders, Inc.
 John J. Powers, III, David Seidman (argued and briefed), U.S. Dept. of Justice, Chief Appellate Section, Antitrust Div., Washington, DC, David F. Hils, Office of the Dept. of Justice, Antitrust Div., Cleveland, OH, for William Barr.
 David F. Hils, Office of Dept. of Justice, Antitrust Div., Cleveland, OH, for James Rill, John Weedon, Paul Binder, and Edmund Round.
 Before: GUY and RYAN, Circuit Judges; and CHURCHILL, Senior District Judge.**
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 Obron Atlantic Corporation appeals the district court's refusal to enjoin federal prosecutors from using, in grand jury or other proceedings, conversations tape recorded by an Obron executive which may implicate Obron in a price-fixing scheme. The district court found that the executive had recorded the conversations "under color of law" so as to exempt the recordings from the prohibitions of the federal Wiretap Act. 18 U.S.C. §§ 2510-2521. Finding no error, we affirm.
 
 I.
 
 2
 James Owen, the Obron executive who recorded his conversations with officers and competitors of the company, was the highest-ranking Obron official in the United States. The company, which sells metallic pigments and powders for use in paints and other products, is headquartered in Germany. Until his termination in April 1989, Owen reported only to Obron's president, Carl Eckart.
 
 
 3
 Owen's recording of conversations began in March of 1987. The month before, Eckart told Owen to discharge Owen's two daughters from the company. Owen's hiring of his daughters apparently had caused some friction within the corporation, and had led to Owen's firing of employees who had complained about the preferential treatment they received.
 
 
 4
 Shortly thereafter, Owen procured a tape recorder. On March 22, 1987, Owen recorded a conversation he had with an Obron director who said that Eckart wanted to fire Owen.[1] The next day, Owen called the Department of Justice Antitrust Division in Cleveland, and informed them of potential antitrust violations within the powdered metals industry. Later that afternoon, Owen met for over two hours with two division attorneys, defendants Paul Binder and Edmund Round. Owen claims that he contacted the division because he "felt that if this ever came to light that [he] would be ... blamed" and he "wanted to clear [his] name." According to Obron, however, Owen was simply angered over his recent rebuke and wanted to retaliate by implicating the company in unlawful conduct.[2]
 
 
 5
 At this meeting, or immediately thereafter, the DOJ attorneys asked Owen if he would be willing to record his conversations with his superiors and with others within the industry. Owen had told them that he was expecting a call at home the next day from a competitor. Following standard procedure, Binder and Round requested permission to investigate from the chief of the Cleveland field office, who in turn forwarded the request to the Antitrust Division in Washington. Due to the need for quick action, the authorization was granted over the phone and later confirmed by a memorandum.
 
 
 6
 The next day, Binder and an FBI agent went to Owen's home to record the scheduled conversation. Binder testified that he gave Owen instructions about how to conduct himself during the recording; for example, he told Owen to try to turn the dialogue to reminiscences about past activity, and warned against initiating or proposing any agreements on pricing. DOJ attorney Round corroborated Binder's testimony in this regard. Binder also testified that Owen received these instructions "from time to time thereafter."
 
 
 7
 That Owen had been asked on March 23, 1987, to assist the government in an undercover capacity was confirmed in an April 1987 letter to Owen's attorney from the chief of the DOJ's Antitrust Division (Great Lakes Office). The letter acknowledged that Owen had agreed to cooperate, but it set forth a specific condition on his participation: Owen was not to engage in "the consensual recording of telephone conversations or of face-to-face conversations, without the authorization or approval of a federal agent or federal attorney assigned to this investigation." Binder and Round testified that, after listening to the tapes Owen would periodically submit, they were satisfied that Owen was following instructions and that there was "no need for us to give Owen prior authorization for every telephone call."
 
 
 8
 Obron does not challenge the use of the FBI-sponsored recording made at Owen's house, nor any others made either by the FBI directly or on FBI equipment.[3] Such recordings, however, constitute only a small portion of the 150 that Owen made during the ensuing two years. Using his own equipment, Owen recorded his conversations with high-ranking Obron officials, Obron competitors, an Obron customer, and Obron's outside accountants. Obron challenges the use of these tapes as prohibited by the Wiretap Act.
 
 
 9
 According to Obron, the tapes were not made "under color of law" so as to exempt them from the general prohibition against use of intercepted communications, but, rather, were the product of Owen's personal vendetta against his employer. Owen, Obron claims, not only used his own equipment, but he was the one to decide which calls to record, and he decided when he would turn the tapes over to the DOJ.[4] Owen also failed to comply with the government's instruction to maintain a log of all of his conversations, whether taped or not. Obron also complains of the lack of regular contact between Owen and the DOJ. While Binder testified that "sometimes there would be several contacts a week with Mr. Owen," and that Owen was told to keep the government apprised of his activities "and what telephone calls he was getting," Obron stresses that there had been no formal procedures in place for meeting regularly with Owen, and that such contact was especially lacking during one ten-month period.[5]
 
 
 10
 A grand jury was eventually convened to investigate the powdered metals industry. According to Obron's complaint, Owen testified before the grand jury on a grant of immunity. Two former Obron employees also were called to testify, and portions of the tapes were played. From the district court's opinion, it appears as if the grand jury was still conducting its investigation as of March 1992.
 
 
 11
 In 1991, Obron sought a preliminary and permanent injunction against the use of the tapes, and any evidence derived from them, before any grand jury or any other proceeding. It also sought to enjoin the use of any grand jury which had received the tapes, or evidence so derived. Obron also sought declaratory relief, as well as costs and attorney fees. Named as defendants, in their official capacities, were the Attorney General of the United States, the Assistant Attorney General of the Antitrust Division, the Chief of the Division's Great Lakes Office, and attorneys Binder and Round.
 
 
 12
 The district court refused to grant either a preliminary or permanent injunction, finding that the use of the tapes and derivative evidence would not violate the Wiretap Act. The court's holding effectively concluded the entire case. Obron now appeals.
 
 II.
 
 13
 Title III of the Omnibus Crime Control and Safe Streets Act of 1968 prohibits the use of intercepted communications, in trials or grand jury proceedings, if disclosure of the intercepted information would violate the Act. 18 U.S.C. § 2515. Disclosure violates the Act if the party who discloses--here, the government--knows or has reason to know that the information was intercepted in violation of the Act. 18 U.S.C. § 2511(1)(c).
 
 
 14
 The parties agree that no violation occurred if Owen, as a party to the conversations, recorded them while "acting under color of law." 18 U.S.C. § 2511(2)(c). Even if Owen did not act under color of law, however, there would have been no violation as long as he did not record his conversations "for the purpose of committing any criminal or tortious act." 18 U.S.C. § 2511(2)(d). The government advanced both of these exceptions to the general rule against use of intercepted communications. The district court relied primarily on the first exception in denying the injunctions, although it also found support in the second exception.[6]
 
 
 15
 There is, of course, no dispute that Owen was a party to the intercepted conversations. As to the second prong of the § 2511(2)(c) exception, "[c]ourts have established that informants who record private conversations at the direction of government investigators are 'acting under color of law.' " United States v. Haimowitz, 725 F.2d 1561, 1582 (11th Cir.), cert. denied, 469 U.S. 1072, 105 S.Ct. 563, 83 L.Ed.2d 504 (1984). Accord United States v. Shields, 675 F.2d 1152, 1156-57 (11th Cir.), cert. denied, 459 U.S. 858, 103 S.Ct. 130, 74 L.Ed.2d 112 (1982); United States v. Tousant, 619 F.2d 810, 813 (9th Cir.1980).
 
 
 16
 The parties have not referred us to any formulas or tests for determining when the government may be said to have "directed" an informant's activities, and our own research has uncovered none.[7] The statute itself is silent on this point. A survey of other cases, however, in which the "color of law" designation was either contested or conceded, indicates that while the typical case involves greater governmental participation in the mechanics of intercepting, the lack of such extensive participation is not necessarily material.
 
 
 17
 In Haimowitz, for example, the FBI "supervised" the taping of the informant's conversations with the defendants, in that the equipment apparently belonged to the FBI, FBI agents had ensured that the informant could not tamper with the tapes, and they retrieved the tapes after each recording. Haimowitz, 725 F.2d at 1581. One of the defendants argued that the informant could not have acted "under color of law" in that he had wielded control over the on/off switch and had made the recordings outside the agents' presence. The court had no difficulty concluding that despite these asserted defects the informant had indeed made the recordings under color of law.
 
 
 18
 A similar conclusion was reached in Shields, even though the informant (unaware he was then acting as such) was one step further removed from the government agents. There, a defendant had hired a private detective to help him record his conversations with his codefendant. The detective reported this request to the FBI--so that it, like the DOJ here, did not make the initial contact--and the FBI told the detective to agree to assist the defendant. The detective wired the defendant with the FBI's equipment, activated the mechanism, and sent the defendant to his meeting. It was the FBI, rather than the detective, who listened to the transmitted conversation. When the defendant returned to his office, the detective removed the equipment from the defendant's body and returned it to the FBI. Subsequent recordings were made in this same fashion. Although the case is somewhat complicated in that it entailed a determination that the "interceptor" was the detective and not the defendant, we find it significant that the detective's control over the recording process, to the exclusion of the FBI, did not detract from his status as one acting "under color of law." Shields, 675 F.2d at 1156-57.[8]
 
 
 19
 While it is again recognized that we deal here with a factual setting distinct from the norm, we cannot say that this distinction warrants a different result. The DOJ attorneys asked for Owen's cooperation; they secured the necessary approval from their superiors, sought assistance from the FBI (for the first call, at Owen's house, and several others thereafter), and instructed Owen repeatedly on how to conduct himself during the conversations. That the DOJ had asked for Owen's cooperation was memorialized in the letter to Owen's lawyer. Although the letter did warn Owen not to intercept any conversations without government authorization, a sensible reading of this instruction, in the context of the DOJ's continued acceptance of Owen's tapes, is that the authorization was given at the outset and had not been revoked. The district court found that, except for the 10-month period (for which he submitted no tapes), Owen and the DOJ "were in continuous contact." Obron does not challenge the court's finding that there were approximately 50 such contacts.
 
 
 20
 Given these facts, we believe the district court properly concluded that Owen had been acting "under color of law" when recording his conversations. The compelling and undisputed evidence of continuous, albeit irregular, contact between Owen and the DOJ attorneys, following their explicit request that he assist them in this very way and their instructions on how to conduct the calls, outweighs the lack of direct DOJ supervision over the recording process and Owen's failure to comply with certain directives.[9]
 
 
 21
 That Owen may have had ulterior motives in assisting the government is immaterial to the applicability of the § 2511(2)(c) exception. As we affirm the district court's decision on this basis, we need not examine whether the evidence, which appears rather scant, would support a finding that Owen had intercepted the conversations for a tortious purpose within the meaning of § 2511(2)(d). Our holding also obviates the need to address the government's other asserted grounds for affirming the denial of the injunction.[10]
 
 
 22
 AFFIRMED.
 
 
 
 *
 This decision was originally issued as an "unpublished decision" filed on February 18, 1993. On April 8, 1993, the court designated the opinion as one recommended for full-text publication
 
 
 **
 Honorable James P. Churchill, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 This first recording, which Owen did not turn over to the government until he produced it at a deposition taken in this case, is not at issue in this appeal
 
 
 [2]
 In support of this interpretation of the events, Obron emphasizes not only the timing of Owen's first contact with the DOJ, but also his admission that he "wasn't sure," as of March 1987, that Obron had violated the antitrust laws. Obron also notes that Owen failed to tell the DOJ attorneys that he already had recorded one conversation (between him and the Obron director), and that he told them he had not received from the company's lawyers certain materials he had requested regarding the antitrust laws, when in fact Owen had received such materials back in January 1987
 
 
 [3]
 On several occasions, the FBI fitted Owen with a "body wire."
 
 
 [4]
 The government does not contest Obron's claim that while Owen sometimes turned over the tapes within a day or two after their making, he would also sometimes wait "weeks, months and even years" before submitting them. (Plaintiff's Brief at 10)
 
 
 [5]
 From October 1987 to August 1988, contact between Owen and the government appears to have been negligible. Owen explained that he had grown "disillusioned" with the investigation during those months. Although attorney Binder recalled that attorney Round had called Owen during that time to see what was happening, Round could not remember having done so. However, since Owen produced no tapes of conversations during this time, there are none challenged
 
 
 [6]
 The court hedgingly stated that "[t]he tape recordings were made under color of law, and those that arguably may not have been made under the direction of the government were not proved to be made with a tortious or criminal intent."
 
 
 [7]
 The vast majority of cases involving the § 2511(2)(c) "color of law" exception focuses on whether a party to the intercepted communications had truly "consented" to the interception
 
 
 [8]
 The absence of "direct" governmental supervision was also deemed immaterial in United States v. Rich, 518 F.2d 980 (8th Cir.1975), cert. denied, 427 U.S. 907, 96 S.Ct. 3193, 49 L.Ed.2d 1200 (1976), but we accord that finding less weight since, in that case, only one among many of the intercepted conversations occurred out of the presence of the government agents; the remainder were recorded while the informant-speaker was seated between two agents who ran the recording devices. Rich, 518 F.2d at 985
 
 
 [9]
 Obron's complaint that Owen did not obey the instruction to keep a log of all his telephone calls, whether he recorded them or not, indicates that, contrary to Obron's claim, the DOJ entrusted Owen with the authority to decide which calls to record
 
 
 [10]
 Among the other issues which we do not address are those concerning the propriety of attempting to enjoin a grand jury proceeding under the circumstances presented here, the court's authority to award attorney fees against the government in a case of this nature, and the issue of whether this is actually a suit against the government or against individual defendants. Because we felt the resolution on the merits at which we arrived was so clearly indicated, we elected to base our decision on this ground and leave for another day issues which were not as fully developed in the record or addressed in the district court