UNITED STATES of America,
Plaintiff-Appellee,

v.

Harold HAIMOWITZ, Dan Scarborough,
George L. Onett,
Defendants-Appellants.

No. 82–3009.

United States Court of Appeals,
Eleventh Circuit.

March 5, 1984.

Nathan Dershowitz, New York City, Lacy Mahon, Jr., Jacksonville, Fla., for Haimowitz.

Denis Dean, Miami, Fla., for Scarborough.

Arthur W. Tifford, Miami, Fla., for Onett.

Carlotta Miller, Curtis Fallgatter, Asst. U.S. Attys., Jacksonville, Fla., for plaintiff-appellee.

Before FAY and HENDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

Defendants Harold Haimowitz, Dan Scarborough, and George L. Onett were indicted on twenty counts. Count One charged that each of the defendants conspired to defraud by using and causing to be used the United States Postal Service in violation of 18 U.S.C. §§ 371 and 1341. Count Two charged that each of the defendants conspired to obstruct interstate commerce by extortion in violation of 18 U.S.C. § 1951. Count Three charged that defendant Haimowitz obstructed and attempted to obstruct interstate commerce by extortion in violation of 18 U.S.C. § 1951. Count Four charged each of the defendants with obstructing and attempting to obstruct interstate commerce by extortion in violation of 18 U.S.C. § 1951. Count Five charged defendants Haimowitz and Scarborough with obstruction and attempted obstruction of interstate commerce by extortion in violation of 18 U.S.C. § 1951. Counts Six through Eight and Ten through Thirteen charged defendant Haimowitz with substantive mail fraud in violation of 18 U.S.C. § 1341. Count Nine charged defendants Haimowitz and Onett with substantive mail fraud in violation of 18 U.S.C. § 1341. Counts Eighteen through Twenty charged

defendant Onett with perjury in violation of 18 U.S.C. § 1623.[1]

After a bench trial in the United States District Court for the Middle District of Florida, Haimowitz was found guilty on Counts One, Two, Four, Five, Six, Seven, Nine and Twelve, Scarborough was found guilty on Counts One, Two, Four, and Five, and Onett was found guilty on Counts One, Two, Four, Nine, Eighteen, and Nineteen.[2] We affirm the conviction of Haimowitz on Counts One, Two, Four, Six, Seven, Nine, and Twelve, of Scarborough on Counts One, Two, and Four, and of Onett on Counts One, Two, Four, Nine, Eighteen, and Nineteen. The convictions of Haimowitz and Scarborough on Count Five are reversed.

## I. FACTS

This case involves a scheme by which Haimowitz, Scarborough, and Onett sought to obtain a liquor license from the state of Florida for Peter Abbott,[3] whom they knew was not qualified to receive a license. To accomplish their scheme, defendants committed federal offenses of mail fraud and extortion. While the facts will be brought out in more detail throughout the opinion, we summarize the district court's findings of facts.

Peter Abbott first approached Haimowitz, a practicing lawyer in Jacksonville, Florida, in October or November of 1979.

Haimowitz assisted Abbott in finding and purchasing a restaurant, which was to be operated as Abbott's Restaurant (the "restaurant"). In order to purchase the restaurant, Abbott needed a Small Business Administration ("SBA") loan. The loan application first reflected Haimowitz as a 10 percent owner but his interest was removed at the bank's insistence. The loan application then was approved reflecting a 50 per cent ownership interest in each of Peter Abbott and Jean Abbott, Peter's wife. The final loan application, which Haimowitz assisted Jean Abbott in executing, showed her as the 100 per cent owner.

The Articles of Incorporation for the restaurant reflect execution by Jean Abbott on December 10, 1979. The document was not actually signed, however, until January 3, 1980, at which time Jean Abbott's name was forged to the Articles by Peter Abbott in the presence of Haimowitz, and the signature was notarized by Haimowitz's secretary at Haimowitz's request.

Haimowitz also assisted the restaurant in obtaining a liquor license. On December 11, 1979, he accompanied Jean Abbott to the Jacksonville office of the Beverage Department of the State of Florida (the "Beverage Department"), where Jean Abbott executed a personal questionnaire and provided the Beverage Department with her

1. Counts Fourteen through Seventeen, which charged defendant Haimowitz with perjury, were severed.

2. Haimowitz was sentenced in the aggregate to three years imprisonment, two years probation, and a $20,000 fine. Scarborough was sentenced to two years imprisonment, three years probation, and a $15,000 fine. Onett was sentenced to six months imprisonment followed by four and one-half years probation, and a $22,500 fine.

3. Peter Abbott was the government's key witness. He first discussed the Jacksonville situation with the FBI in March 1980. In May 1980, the FBI began its undercover operation with audio and visual recordings. Abbott testified under a grant of immunity pursuant to a plea agreement, which provided that in exchange for his plea of guilty to wire fraud and his cooperation, he would receive a maximum sentence of three years in prison.

The district court prefaced its detailed findings of fact with a brief statement regarding the credibility of Abbott. The district court noted that Abbott admitted to having defrauded from six to twelve banking institutions of between $300,000 and $750,000, that he had six larceny convictions, that he participated in two previous Small Business Administration loan frauds, that he participated in two arsons, that he participated in narcotic sales, and that after his arrival in Jacksonville, he participated in a fraudulent Small Business Administration loan and numerous other bad acts, for all of which he was granted governmental immunity. Abbott pled guilty to interstate wire fraud in January 1981, for which he has not been sentenced. Abbott has also used different social security numbers illegally. The district court stated that it placed no stock in the truthfulness of his testimony except for when the truth was obvious.

fingerprints. In February, Haimowitz again accompanied Jean Abbott to the Beverage Department to file applications for a temporary liquor license and permanent transfer of the liquor license. The officer in charge of the Beverage Department advised Haimowitz of the procedures for processing the applications, including the fact that all correspondence and applications were mailed from the Jacksonville office of the Beverage Department to the Tallahassee office. An investigator from the Beverage Department made an on-site inspection of the restaurant, at which time Peter Abbott told the investigator that he and his wife, Jean, were divorced. Abbott reported this conversation to Haimowitz, and Haimowitz advised Abbott that he should not tell the beverage officials that he was divorced because they could determine the falsity of that allegation, but rather Abbott should tell them that he and his wife were separated and going to get divorced.

In March, the first temporary liquor license was issued to the restaurant and the restaurant opened for business. Peter Abbott provided Haimowitz with the fee for the temporary license. In April, an investigator for the Beverage Department met with Haimowitz at the latter's office to examine the corporate books of the restaurant. Haimowitz denied that Peter Abbott had any interest, direct or indirect, in the restaurant and advised the investigator that the books were not ready but that they would be provided at a later date. Haimowitz bragged to the investigator about his association with the defendant Scarborough, whose photograph appeared in Haimowitz's office.

Subsequently, Haimowitz filed affidavits with the Beverage Department executed by Peter and Jean Abbott, which provided that Peter Abbott had no interest in the restaurant and would not continue to sign checks on the restaurant account. Nevertheless, Abbott continued to sign many more checks, including some to Haimowitz. Ab-

bott also signed the original check for a second temporary liquor license fee. Haimowitz met with the supervising officer of the Beverage Department and told the supervisor that Peter Abbott had no interest in the restaurant business. The supervisor informed Haimowitz of the statutory requirement of disclosure of all interested parties. Haimowitz told his secretary, upon her inquiry, that the reason for placing everything in Jean Abbott's name was that Peter Abbott was a convicted felon and that this information should remain secret.

Upon the insistence of the supervisor of the Beverage Department, Peter Abbott was taken by Haimowitz to the Jacksonville Beverage Department office to be fingerprinted. Haimowitz advised Abbott to keep quiet and follow his instructions. He also advised Abbott that even if the fingerprint investigation came back positive, they should not be concerned because all of the paperwork reflected that Peter Abbott had no interest in the restaurant.

On April 22, 1980, the Beverage Department disapproved the application for transfer of the liquor license. When Beverage Department officials attempted to pick up the temporary license from the restaurant, Abbott got in touch with Haimowitz, who obtained a temporary injunction from a state court judge. Subsequently, Haimowitz and Louis H. Ritter, Sr.[4] met with Charles Nuzum, the director of the Beverage Department, in Tallahassee. Nuzum advised Haimowitz and Ritter of the Beverage Department's concern regarding the liquor license application, and instructed them that the application must be amended to accurately reflect the true source of the funds used to acquire the restaurant, all parties directly or indirectly interested in the restaurant, and the correct marital status of Peter and Jean Abbott.

Thereafter, Haimowitz met with defendant Scarborough in the latter's legislative office. Scarborough at that time was a state senator from the Jacksonville, Duval

---

**4.** Ritter was indicted on various counts with the other defendants but was acquitted on all charges.

County, Florida area and was President Pro Tem of the Florida Senate. Scarborough suggested to Haimowitz that Haimowitz talk to defendant Onett, a lawyer engaged in lobbying activities in the state capital, for assistance in obtaining the transfer of the permanent liquor license. Subsequently, Haimowitz advised Abbott that Scarborough would obtain the services of Onett and that Onett had wanted $25,000, but Haimowitz had talked Onett down to $20,000, and Scarborough had further "muscled" Onett down to $15,000.

In May, Onett told Nuzum that he was working with Haimowitz on the Abbott's Restaurant liquor license application. Nuzum advised Onett of the same matters which he had reported to Haimowitz, including the requirements to obtain approval of the license transfer application. Onett advised Nuzum that Peter Abbott had no ownership interest, direct or indirect, in the restaurant operation.

In the meantime, Haimowitz filed an amended application in the Jacksonville office of the Beverage Department for the transfer of the permanent liquor license. Haimowitz accompanied Jean Abbott to the office and instructed her to let him do the talking. Later, Haimowitz met with Peter Abbott and advised him not to tell his wife that he was "paying off" for the liquor license. Haimowitz also advised Abbott how to phrase his conversation with Scarborough when they were to meet with Scarborough later that week. In addition, Haimowitz told Abbott that Scarborough was upset because Abbott had not yet paid the $15,000.

On May 24, 1980, Peter Abbott was videotaped counting $7,500 in denominations of $10 and $20 bills. Abbott placed the money in a manila envelope and handed it to Haimowitz, who ultimately left the restaurant carrying the manila envelope. Nearly six

weeks later, in July, 1980, Onett instructed his secretary to type a letter receipt to Jean Abbott for the $7,500 cash paid by Peter Abbott. The letter was not delivered until July, 17, 1980. Haimowitz told Peter Abbott that his money would be returned if Onett was not able to obtain the permanent liquor license.

In June, Ritter obtained copies of newspaper clippings regarding Peter Abbott, which he discussed with Haimowitz and Scarborough. In July, Onett, Scarborough and his wife, and others had dinner at the restaurant, at which time Onett and Scarborough discussed that Peter Abbott was a "bad guy" and in the "Mafia." They also stated that they were attempting to place all of Peter Abbott's assets in his wife's name. Upon departing the restaurant, Scarborough introduced Abbott as the owner of the restaurant.

Some time in August, the restaurant closed. On August 21, 1980, the Beverage Department finally disapproved the liquor license transfer application.

## II. HAIMOWITZ

We will examine the claims of each defendant individually. Haimowitz makes the following claims on appeal: 1) his convictions for conspiracy to commit mail fraud and for mail fraud cannot stand; 2) his guilt on the counts of conspiracy, extortion, and attempted extortion was not established beyond a reasonable doubt; 3) he was prejudiced by being required to elect entrapment before the government completed its case; 4) his motion for a new trial based upon newly discovered evidence amounting to "governmental misconduct" should have been granted; and 5) the convictions rest on inadmissible hearsay.[5]

The first issue is whether Haimowitz's convictions for conspiracy to commit mail fraud and for mail fraud can stand. Haimowitz was convicted of using the Postal

---

**5.** Haimowitz also contends that the search warrant used to search his office was improper. He incorporates the legal arguments made in an appeal to this Court in *United States v. Haimowitz,* 706 F.2d 1549 (11th Cir.1983), where he challenged the seizure of evidence based upon the same warrant. We adopt the

reasoning of that opinion and hold that the warrant was valid.

In addition, Haimowitz incorporates arguments raised by his co-defendants. Because we affirm the convictions of his co-defendants, we need not reach the question of Haimowitz's standing to raise these arguments.

Service to execute a scheme to defraud and to obtain property by means of false and fraudulent representations in violation of 18 U.S.C.A. § 1341[6] (Counts Six, Seven, Nine, and Twelve) and of conspiring to commit mail fraud in violation of 18 U.S.C.A. § 371[7] (Count One). The district court found that the nature of the scheme was to defraud the citizens of Florida and the Beverage Department of the right to the honest and faithful performance of defendant Scarborough in his official capacity as a state senator, and of the right to pertinent and true information in the administration of Florida's laws. The district court also found that the scheme was executed to obtain a temporary and permanent alcoholic beverage license for the restaurant by false and fraudulent pretenses, representations, and promises, and by the intentional and knowing concealment of material facts.[8]

■ A conviction for mail fraud under 18 U.S.C.A. § 1341 requires proof: 1) of the

---

6. 18 U.S.C.A. § 1341 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

7. 18 U.S.C.A. § 371 provides:

If two or more persons conspire, either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

8. The Florida statutes regulating alcoholic beverage license applications provide in pertinent part:

561.15 *Licenses: qualifications required*

(1) Licenses shall be issued to persons of good moral character who are not less than 19 years of age. Licenses to corporations shall be issued only to corporations whose officers are of good moral character and not less than 19 years of age. There shall be no exemptions from the license taxes herein provided to any person, association of persons, or corporation, any law to the contrary notwithstanding.

(2) No license under the Beverage Law shall be issued to any person who has been convicted within the last past 5 years of any offense against the beverage laws of this state, the United States, or any other state; who has been convicted within the last past 5 years in this state or any other state or the United States of soliciting for prostitution, pandering, letting premises for prostitution, keeping a disorderly place, or illegally dealing in narcotics; or who has been convicted in the last past 15 years of any felony in this state or any other state or the United States; or to a corporation, any of the officers of which shall have been so convicted.

561.17 *License applications; approved person*

(1) Any person, before engaging in the business of manufacturing, bottling, distributing, selling, or in any way dealing in alcoholic beverages, shall file, with the district supervisor of the district of the division in which the place of business for which a license is sought is located, a sworn application in duplicate on forms provided to the district supervisor by the division. Prior to any application being approved, the division may require the applicant to file a set of fingerprints on regular United States Department of Justice forms for himself and for any person or persons interested directly or indirectly with the applicant in the business for which the license is being sought, when so required by the division. If the applicant or any person who is interested with the applicant either directly or indirectly in the business or who has a security interest in the license being sought or has a right to a percentage payment from the proceeds of the business, either by lease or otherwise, is not qualified, the application shall be denied by the division. . . .

561.18 *License Investigation*

After the application has been filed with the local district office supervisor, the district

participation by the defendant in a scheme to defraud; 2) of the use of the mails in furtherance of the scheme; and 3) that the defendant connected with the scheme used or caused the use of the mails. *United States v. Hartley,* 678 F.2d 961, 985 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983). *See also Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954); *United States v. Martino,* 648 F.2d 367, 394 (5th Cir.1981); *United States v. Green,* 494 F.2d 820, 823 (5th Cir.), *cert. denied,* 419 U.S. 1004, 95 S.Ct. 325, 42 L.Ed.2d 280 (1974).

■■■ The district court found that the government proved the three requirements. In examining the sufficiency of the evidence, the court of appeals must review the evidence in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Pullen,* 721 F.2d 788, at 790–791 (11th Cir.1983). This Court must make all reasonable inferences and credibility choices in favor of the fact-finder's verdict. *United States v. Pullen,* at 790–791; *United States v. Morano,* 697 F.2d 923, 927 (11th Cir.1983). We hold that the record supports the finding by the district court that Haimowitz conspired to and participated in a scheme to defraud, that the mails were used in furtherance of the scheme, and that Haimowitz caused the use of the mails.

Under the first element, the government was required to show that the defendant participated in a scheme to defraud. First, the record shows that Haimowitz misrepresented to the Beverage Department that Peter Abbott had no interest, direct or indirect, in the ownership of the restaurant and that he would not acquire any in the future. Haimowitz looked for potential restaurants with Peter Abbott alone, not with Jean Abbott. Haimowitz drafted a contract for Peter Abbott, as purchaser, to purchase the

restaurant and Peter Abbott, not Jean, provided Haimowitz with the $3,000 for the seller. Peter Abbott and Haimowitz decided that Haimowitz was to have an ownership interest. The loan approved on December 17, 1979 by the American National Bank reflected a 50 per cent ownership interest in each of Peter and Jean Abbott. It was not until the SBA loan for the purchase of the restaurant was closed on January 4, 1980 that the document showed that Jean Abbott owned 100 per cent of the restaurant. Haimowitz was aware that Abbott signed checks for the restaurant even though Abbott supposedly had no interest. When Haimowitz needed authorization for expenditures of $15,000 to obtain the assistance of defendant Onett, he looked to Peter Abbott, not Jean. A personal financial statement of Abbott that was seized from Haimowitz's office reflected that Peter Abbott was the president and general manager of the restaurant.

Jean Abbott testified that she was the owner "on paper only." On paper, she owned all of the outstanding shares of the restaurant and was the president, vice-president, secretary, treasurer, and sole director of the corporation. She had not even signed the Articles of Incorporation for Abbott's Restaurants, Inc.—Peter Abbott forged his wife's name in Haimowitz's presence.

Haimowitz knew that Peter Abbott and not Jean Abbott was the owner, yet he misrepresented Peter Abbott's ownership interest to the Beverage Department. Haimowitz accompanied Jean Abbott when she alone went to the Beverage Department to execute a personal questionnaire and provide the Department with her fingerprints. Haimowitz denied to an investigator for the Beverage Department that Peter Abbott had any direct or indirect interest in the restaurant. Haimowitz prepared affidavits for execution by Peter and Jean Abbott,

supervisor shall cause the application to be fully investigated, both as to qualifications of the applicants and a manager or person to be

in charge and the premises and location sought to be licensed. . . .

which provided that Peter Abbott had no interest in the restaurant.

Haimowitz not only misrepresented Peter Abbott's ownership, he also tried to conceal it. He rejected the suggestion of an advertising agent that Peter Abbott's alleged impressive background in restaurant management be included on the menu for the restaurant. Haimowitz continually instructed Peter Abbott to create an appearance to his employees and others that he was simply a manager-employee. Haimowitz and defendant Scarborough discussed with Abbott the hiding of his business cards, and both instructed Abbott to maintain a "low profile."

Second, the record shows that Haimowitz, during the pendency of the liquor license application, believed that Peter Abbott had a felony conviction and yet concealed this from the Beverage Department. Haimowitz had conversations with Onett and others in which they discussed that Abbott's vehicular homicide conviction would be "taken" by the state beverage officials as a misdemeanor, thereby indicating knowledge of the fact that it was a felony but would merely be "taken" in the lesser category of a misdemeanor. The district court found it inconceivable that a practicing attorney would consider a vehicular homicide to be a misdemeanor. Haimowitz became upset when the staff attorney for the Department of Business Regulations stated that it was not his understanding that Peter Abbott's vehicular homicide would be considered as a misdemeanor. The district court found it reasonable to infer that Haimowitz would not have become upset but for the fact that Haimowitz believed the true status of the vehicular homicide to be that of a felony. Finally, in April 1980, Haimowitz told his secretary that the reason for placing all of the paperwork and ownership in Jean Abbott's name was that Peter Abbott was a convicted felon.

Third, the record shows that Haimowitz misrepresented and concealed the amounts and sources of monies invested in the restaurant. Haimowitz assisted Peter Abbott in securing almost 100 per cent financing for the restaurant and was aware that Peter Abbott had invested only between $10,000 and $12,000 in the venture. Haimowitz assisted Jean Abbott in completing the personal questionnaire for the Beverage Department, which suggested that approximately $200,000 was to be invested. In connection with an amendment to the liquor license application, Haimowitz submitted a schedule of secured funds to the Beverage Department which reported a personal investment of approximately $66,000. Both of these figures were false and known by Haimowitz to be false by virtue of his own testimony that he knew Peter Abbott had actually invested only between $10,000 and $12,000. Peter Abbott advised Haimowitz that the Charter Company stock listed on the personal questionnaire executed by Jean Abbott was not in fact owned by either of the Abbotts. Peter Abbott told Haimowitz that the money invested in the restaurant was "washed money." Haimowitz stated in reply, "Now I got to cover that up." Haimowitz did, in fact, cover that up when he filed the schedule of secured funds on May 8, 1980.

Fourth, the record shows that Haimowitz misrepresented to the Beverage Department that Peter and Jean Abbott were experiencing domestic difficulties and were contemplating a divorce. Jean Abbott testified that she did not tell Haimowitz of any marital difficulties and that none existed. Haimowitz had a social relationship with the Abbott family and never discussed with them filing divorce or separation papers. Haimowitz attended the closing on a home purchased jointly by Peter and Jean Abbott. Having learned that Peter Abbott had told the Beverage Department investigator that he and Jean were divorced, Haimowitz advised Peter Abbott to merely suggest that the Abbotts were going to get a divorce because Haimowitz could not substantiate that the Abbotts were divorced.

■ Having established that Haimowitz participated in a scheme to defraud, under

the second and third elements of mail fraud, the government must then show that the mails were used in furtherance of the scheme and that Haimowitz used or caused the use of the mails. Under 18 U.S.C.A. § 1341, the mailing does not have to be an essential element of the scheme; it is sufficient if the mailing is incidental to an essential part of the scheme. *Pereira v. United States,* 347 U.S. at 8, 74 S.Ct. at 363, 98 L.Ed. 435; *United States v. Martino,* 648 F.2d 367, 394 (5th Cir.1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982); *United States v. Green,* 494 F.2d 820, 823–24 (5th Cir.), *cert. denied,* 419 U.S. 1004, 95 S.Ct. 325, 42 L.Ed.2d 280 (1974). In this case, the liquor license applications, upon which the scheme was based, were mailed from the Jacksonville office of the Beverage Department to its office in Tallahassee on March 14, 1980, April 8, 1980, May 12, 1980, and June 18, 1980.[9]

■ A defendant "causes" the mails to be used when he or she acts with the knowledge that the use of the mails will follow in the ordinary course of business, or when such use can reasonably be foreseen, even though not actually intended. *Pereira v. United States,* 347 U.S. at 8–9, 74 S.Ct. at 363, 98 L.Ed. 435; *United States v. Green,* 494 F.2d at 824. It is not necessary that the defendant do any of the mailing. *Pereira v. United States,* 347 U.S. at 8, 74 S.Ct.

at 363, 98 L.Ed. 435; *United States v. Martino,* 648 F.2d at 394. Haimowitz did not actually do any of the mailing. Nevertheless, he had been advised that all liquor license correspondence and applications must be mailed from the Jacksonville office to the Tallahassee office.

■ Thus, Haimowitz conspired with Scarborough and Onett to defraud and to unlawfully obtain property in violation of 18 U.S.C.A. § 371. Having devised the scheme, he unlawfully and willfully caused liquor license correspondence and applications to be sent and delivered by the United States Postal Service in violation of 18 U.S.C.A. § 1341. Therefore, we affirm Haimowitz's conspiracy and substantive mail fraud convictions.[10]

Haimowitz's second claim is that his guilt for conspiracy to extort, extortion, and attempted extortion was not established beyond a reasonable doubt (Counts Two, Four, and Five). Under the Hobbs Act, it is a crime to obstruct or affect interstate commerce by obtaining the property of another through extortionate means. 18 U.S.C.A. § 1951.[11] "Extortion" is defined as "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C.A. § 1951(b)(2). The district court found that extortion was accomplished by both statuto-

---

9. Haimowitz argues that the expansion of the reach of federal authority and jurisdiction to state liquor transactions solely on the basis of intra-departmental mailings is an overly-broad interpretation of 18 U.S.C.A. § 1341. This Court finds that the requirements of § 1341 have been met. *See Bannister v. United States,* 379 F.2d 750 (5th Cir.1967), *cert. denied,* 390 U.S. 927, 88 S.Ct. 861, 19 L.Ed.2d 988 (1968) (§ 1341 violation when office communications were mailed between a Jacksonville insurance agency and the home office in New York); *Blachly v. United States,* 380 F.2d 665, 671 (5th Cir.1967) ("The crime of mail fraud is broad in scope.")

10. Haimowitz also contends that his professional obligations as an attorney compelled him to act as he did. This Court disagrees that an attorney's professional obligations require him

to engage in crime with his client. *Cf. United States v. Kelly,* 569 F.2d 928, 938 (5th Cir.); *cert. denied,* 439 U.S. 829, 99 S.Ct. 105, 58 L.Ed.2d 123 (1978); *United States v. Gordon-Nikkar,* 518 F.2d 972, 975 (5th Cir.1975).

11. 18 U.S.C.A. § 1951(a) provides:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

ry means—under color of official right and by fear of financial and economic loss and injury to the business of the restaurant.

■ Haimowitz contends that any extortion conviction resting on fear of economic loss must fail, because Haimowitz did not instill fear and because Abbott was cooperating with the federal authorities, and therefore had no expectation of receiving a liquor license. The fear experienced by the victim does not have to be the consequence of a direct threat. Rather, extortion is found if the circumstances render the victim's fear reasonable. *United States v. Kopituk,* 690 F.2d 1289, 1328 (11th Cir. 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983); *United States v. Sander,* 615 F.2d 215, 218 (5th Cir.1980); *United States v. Quinn,* 514 F.2d 1250, 1266–67 (5th Cir.1975), *cert. denied,* 424 U.S. 955, 96 S.Ct. 1430, 47 L.Ed.2d 361 (1976). Fear of economic loss is a type of fear within the purview of § 1951. *United States v. Kopituk,* 690 F.2d at 1328; *United States v. Sander,* 615 F.2d at 218; *United States v. Quinn,* 514 F.2d at 1267. The defendant does not need to have caused the fear; the statute is satisfied if he or she intended to exploit the fear. *United States v. Gerald,* 624 F.2d 1291, 1299 (5th Cir.1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981).

■ In this case, the restaurant needed a state liquor license to operate as a supper club. The license was vital to the economic well-being of the establishment. Haimowitz pressured Peter Abbott to pay defendant Onett $15,000 to obtain the liquor license. In particular, the record shows that Haimowitz reported to Abbott that Senator Scarborough was so upset that Abbott had not yet paid that he was going to quit helping and that Haimowitz did not know what that would mean.

Thus, we accept the district court's finding that Peter Abbott had a reasonable fear of economic loss, which Haimowitz exploited. The fact that Abbott had begun cooperating with federal authorities when he paid the $7,500 does not support defendant's position that Abbott could not be the victim of extortion. In *United States v. Quinn,* 514 F.2d at 1267, the court stated that "[t]he Hobbs Act forbids attempted extortion as well as actual extortion. Therefore, in a case where the F.B.I. foils the actual offense, it is possible for one to commit attempted extortion." *See also Blachly v. United States,* 380 F.2d 665, 673 (5th Cir. 1967) (success of the scheme to defraud is not essential to completion of the offense).

■ The government also based its case against Haimowitz on his involvement in a conspiracy to extort money from Abbott "under color of official right." We hold that there is sufficient evidence in the record to support the district court's finding that Haimowitz was part of a scheme by which Scarborough used his official office to extort money from Peter Abbott. The Fifth Circuit has stated that "[i]n proving the crime of extortion, where intent often must be inferred from ambiguous statements and situations, the jury's verdict must be accorded substantial weight." *United States v. Duhon,* 565 F.2d 345, 352 (5th Cir.), *cert. denied,* 435 U.S. 952, 92 S.Ct. 1580, 55 L.Ed.2d 802 (1978). Here, the district court judge acted as jury and thus his verdict must be accorded substantial weight.

The record shows that Haimowitz advised Peter Abbott that they should secure the services of defendant Scarborough, who was then a state senator, because he had a great deal of clout. Haimowitz also advised Peter Abbott that Scarborough was so powerful that he had gotten the governor to appoint Haimowitz to the Construction Licensing Board of the State. Haimowitz suggested that Scarborough would be able to place pressure on the Director of the Division of Alcoholic Beverages, and Scarborough advised that he had "made a believer" out of the Director on a prior occasion. From conversations among Scarborough, Haimowitz, and Peter Abbott, the

finder of fact could infer that defendants were willing to corrupt Scarborough's office and participate in influence peddling.

Haimowitz's instruction to Peter Abbott to refer to the payment as a "fee" when discussing the payment with Scarborough is indicative of the extortionate nature of the payment. The evidence also shows that the payment was made in cash, that it was paid one day after Onett commenced work on the application, that transfers of such licenses are frequently accomplished without attorney assistance, that Onett neglected to make a notation of the receipt in his law account, and that Onett did not draw up a receipt until almost six weeks after the $7,500 cash was paid.

■ Haimowitz also contends that the government has not established the effect on interstate commerce required under 18 U.S.C.A. § 1951. The statute defines commerce in broad terms, 18 U.S.C.A. § 1951(b)(3), and the Fifth Circuit has indicated that a showing of a minimal effect on interstate commerce will sustain jurisdiction under the statute. *See United States v. Gerald,* 624 F.2d at 1299 (jurisdictional interstate commerce element generally does not place a large burden on the government because even a minimal effect on interstate commerce will sustain jurisdiction under the statute); *United States v. Sander,* 615 F.2d 215, 218 (5th Cir.1980). The district court found that the minimal effect on interstate commerce was shown since the restaurant regularly utilized and sought to utilize professional entertainers from other states who were transported in interstate commerce, and liquor, foodstuffs, and other materials that were produced in other states and transported in interstate commerce. We will not disturb its finding.

■ Haimowitz was also convicted for extortion on Count Five, which alleges that

he attempted to extort $1,000 from Abbott as a campaign contribution for Scarborough. We agree with Haimowitz that the evidence in support of Count Five was deficient.[12] First, there was no showing that Haimowitz participated in the solicitation and secondly, there was no proof that this demand was coupled with a promise by Scarborough to perform some act of official grace. *See United States v. Dozier,* 672 F.2d 531, 537 (5th Cir.), *cert. denied,* 459 U.S. 943, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982).

Haimowitz's third basis for appeal is that the district court erroneously required him to elect whether he would rely on the defense of entrapment. Before the government rested its case, it moved the district court to compel defendants to declare whether they were relying on the entrapment defense based on the evidence in the government's case-in-chief. Defendants objected on the theory that the absence of any local rule indicated that the court was without authority to require such an election. The district court granted the government's motion and defendants announced that they would not rely on the entrapment defense.

Haimowitz contends that the district court erred because, procedurally, the issue of entrapment first is injected by the defendant into the case and then the government may offer evidence to rebut the defense. According to Haimowitz, the district court's order compelled defendants to either waive the defense of entrapment or admit culpability and face predisposition evidence as part of the government's case-in-chief.

■ We disagree with Haimowitz's analysis. Although the general rule is that entrapment may not be raised as a defense unless the defendant admits the acts upon which the prosecution is based, *United*

---

12. The evidence consists of the following taped conversation:

Scarborough: I'm running for re-election by the way.
Haimowitz: Wait a minute, we'll get into that later.

Scarborough: No, no, no, I'll get into this now. I need a thousand dollars from you when I run, in the form of a company check.
Abbott: No problem. I, you got it. . . .

*States v. Nicoll,* 664 F.2d 1308, 1314 (5th Cir.), *cert. denied,* 457 U.S. 1118, 102 S.Ct. 2929, 73 L.Ed.2d 1330 (1982), an exception to the rule arises if the government's own case-in-chief injects substantial evidence of entrapment into the case. Then the defendant may raise the defense of entrapment even though he denies the acts upon which the prosecution is predicated. *United States v. Greenfield,* 554 F.2d 179, 182 (5th Cir.1977), *cert. denied,* 439 U.S. 860, 99 S.Ct. 178, 58 L.Ed.2d 168 (1978); *Sears v. United States,* 343 F.2d 139, 143–44 (5th Cir.1965). Thus, defendants were not required to admit wrongdoing. Nor were defendants precluded from presenting an entrapment defense in their own case-in-chief. The government stated that it only sought an announcement by defendants of their intention to rely on entrapment based on the government's case-in-chief, and that it was not preventing defendants from later raising the entrapment defense. The government asked if defendants were ready to elect the entrapment defense so it would know whether to proceed with predisposition evidence in its case-in-chief. The district court did not require a waiver of the entrapment defense, but merely employed a procedural vehicle to ensure the orderly presentation of evidence. *Cf. United States v. Ramirez,* 533 F.2d 138 (5th Cir.), *cert. denied,* 429 U.S. 884, 97 S.Ct. 235, 50 L.Ed.2d 165 (1976) (the trial court's limitation of cross-examination was clearly within its discretion); Rule 611(a) of the Federal Rules of Evidence. Thus, there was no prejudicial error.

 Haimowitz's fourth contention on appeal is that his motion for a new trial based upon newly discovered evidence amounting to governmental misconduct should have been granted. Peter Abbott was arrested on June 4, 1982, almost two months after the trial ended, on charges of federal tax fraud. Haimowitz asserts that the government knew of this fraud during his trial and that disclosures of the criminal investigation would have been significant as to Peter and Jean Abbott's credibility and as to the possible existence of vital documents and records.

The denial of such a motion will be reversed only when it is shown that the ruling is so clearly erroneous as to amount to an abuse of the district court's sound discretion. *United States v. Mesa,* 660 F.2d 1070, 1077 (5th Cir.1981). Five elements must be present to justify a new trial: 1) the evidence must be discovered following trial; 2) the movant must show due diligence to discover the evidence; 3) the evidence must not be merely cumulative or impeaching; 4) the evidence must be material to issues before the court; and 5) the evidence must be of such a nature that a new trial would probably produce a new result. *United States v. Mesa,* 660 F.2d at 1077. The factfinder in this case, the judge, was already aware of numerous past offenses committed by Peter Abbott.[13] Defendant has not demonstrated in what way Peter Abbott's conviction affected Jean Abbott's credibility or in what way the "possible" documents were material to this case. The United States stated that it first learned of the IRS investigation on April 29, 1982, five days after the trial ended. Thus, Haimowitz failed to show that he was entitled to a new trial based on newly discovered evidence.

 Haimowitz's final contention is that his convictions rest on inadmissible hearsay. Under Rule 801(d)(2)(E) of the Federal Rules of Evidence, a statement is not hearsay if it is offered against a party and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Although such statement is not hearsay, it is admissible only if there is proof that a conspiracy exists, that the statement was made during the course of and in furtherance of the conspiracy, and

---

**13.** In his findings of fact, the district court judge listed Peter Abbott's past "bad acts" and stated that he placed no stock in the truthful-ness of Abbott's testimony except when the truth was obvious. *See supra* footnote 3.

that the declarant and the defendant were members of the conspiracy. *United States v. James,* 590 F.2d 575, 578 (5th Cir.) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).

 During the government's case, each defendant objected, on hearsay grounds, to the admission of testimony regarding out-of-court statements by Peter Abbott, Jean Abbott, and codefendants. The district court admitted the statements subject to being connected up. Immediately prior to closing arguments, the district court ruled that it had found substantial evidence of a conspiracy and it overruled all continuing objections to the allegedly inadmissible hearsay. Haimowitz contends that the trial court's duty was not satisfied by its conclusory ruling. We hold that there was sufficient independent evidence of a conspiracy to warrant admissions of the statements and that the district court was not required to hold a hearing on this issue before admitting the statements but rather, was allowed to admit the statements "subject to being connected up." *United States v. James,* 590 F.2d at 582. *Accord, United States v. Hawkins,* 661 F.2d 436, 449 (5th Cir.1981), *cert. denied,* 457 U.S. 1137, 102 S.Ct. 2967, 73 L.Ed.2d 1355 (1982). Furthermore, *James* does not require the district court to articulate the facts and reasons in support of its ruling.

## III. SCARBOROUGH

Defendant Scarborough makes the following claims on appeal: 1) the district court erred in refusing to order the production of an FBI agent's notes of statements given by Scarborough; 2) the district court erred in denying his motion for directed verdict of acquittal at the close of all of the evidence; and 3) the district court erred in denying his motion for judgment of acquittal for "outrageous governmental conduct."

 The first issue raised by Scarborough is whether the district court erred in

refusing to order the production of an FBI agent's notes of statements given by Scarborough. On August 28, 1980, FBI Agent Gerald Collins met and interviewed Scarborough in the Jacksonville FBI office for approximately one hour. Agent Collins took notes during the interview, and he later dictated a statement to his secretary based on his notes. He acknowledged that the typed statement was not "a word for word verbatim statement of everything that Dan Scarborough said." After the statement of August 28 was typed up, it was delivered to Scarborough and he was told to check it to make sure it was correct, and that he could add or change anything. On September 2, 1980, Scarborough returned the statement to the FBI with corrections. At trial, the government used the differences between the original and corrected statements to impugn Scarborough's credibility. The district court denied Scarborough's motion to order the FBI agent to produce his notes from which he dictated the initial statement. In its findings, the district court included the evidence of discrepancies between the August 28 and September 2 statements as one of seven factors indicating that Scarborough was not credible.

In this appeal, Scarborough implies that he is relying on *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1957), for the proposition that the government was required to produce the notes. At trial, however, the district court asked defendant's counsel for his authority for the production of the notes. Counsel stated that he was not suggesting the presence of a Jencks Act violation nor did he mention *Brady.* Rather, counsel based his request for production of the notes, as near as we can tell from the record, on the best evidence rule.[14] Because "a party cannot object on one ground in the trial court and then urge on appeal that the

---

**14.** The trial record reveals that Scarborough's counsel's objections were limited to the following:

objection should [be] sustained on another ground", *United States v. Haynes,* 573 F.2d 236, 241 n. 8 (5th Cir.), *cert. denied,* 439 U.S. 850, 99 S.Ct. 154, 58 L.Ed.2d 153 (1978), we hold that Scarborough failed to preserve his claim for proper appellate review.

 Scarborough's second issue ·is whether the district court erred in denying his motion for directed verdict of acquittal at the close of all of the evidence. As stated earlier, when a criminal defendant challenges the sufficiency of the evidence to support his conviction, an appellate court must view the evidence and inferences in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

Like Haimowitz, Scarborough was found guilty of conspiring to commit mail fraud, 18 U.S.C.A. § 1341,[15] in violation of 18 U.S.C.A. § 371[16] (Count One). The record shows that Scarborough was willing to permit, encourage, and assist the concealment of Abbott's ownership interest and background in obtaining the license. Scarborough knew of the contents of the liquor license, which did not show that Peter Abbott had an ownership interest in the restaurant. Yet Scarborough testified that he believed Peter Abbott had an ownership interest in the restaurant. On one occasion, Scarborough introduced Peter Abbott as the "owner" of the restaurant. Scarborough also knew of Peter Abbott's criminal and improper background. Peter Abbott told Scarborough that the source of the money used in making the $1,000 payment to Ritter was "washed" money that Peter Abbott, not Jean, possessed. In the presence of Onett, Scarborough mentioned that

Peter Abbott was in the "Mafia" and was a convicted felon. Scarborough reported to Peter Abbott that both he and Onett were aware that Abbott was involved with the license and that Abbott had something improper in his background or otherwise that would normally prevent him from obtaining a liquor license. Although Scarborough knew of the difficulties in obtaining the license, he repeatedly assured Peter Abbott that he would get his license. Scarborough advised Peter Abbott to try to keep a "low profile." He discussed placing the restaurant's assets in Jean Abbott's name so that the restaurant could obtain a liquor license. Scarborough was aware that one of the principal reasons that the Beverage Department scrutinized applicants was to keep criminal figures out of the liquor business. Thus, we cannot accept Scarborough's characterization of his involvement as simply that of a senator advising a constituent.

Viewing the evidence in the light most favorable to the government, we hold that there was sufficient evidence in the record to support the district court's finding that Scarborough participated with Onett and Haimowitz in the conspiracy to commit mail fraud. Scarborough knew of Abbott's misrepresentations to the Beverage Department, yet he helped conceal them.

 The district court also found that Scarborough, with Haimowitz and Onett, conspired to induce and did induce Peter Abbott and Abbott's Restaurants, Inc. to part with property by extortion (Counts Two, Four and Five). Scarborough and Haimowitz discussed with Peter Abbott their willingness to corrupt Scarborough's office and participate in influence peddling.

---

The Court: What authority is there for those notes?

Mr. Dean: The notes, Your Honor, would be the best evidence as to what appeared in the *statement that was eventually typed up on August 28.* . . .

The Court: You are not suggesting that it is Jenk's [sic] Act or anything like that?

Mr. Dean: No. I am suggesting the notes would be the best evidence as to what was actually said on the 28th rather that what

some secretary supposedly typed up and presented to, at that time, Senator Scarborough, in which changes were made.

The Court: Well, I am not going to order *them to produce.*

15. *See supra* footnote 6 for text of § 1341.

16. *See supra* footnote 7 for text of § 371.

Scarborough assured Peter Abbott that if the application was not approved, Scarborough would see that Peter Abbott's money was returned. Although Scarborough first denied to a local television station that he delivered any cash to Onett, he subsequently testified as to how he meticulously hid the money in the trunk of his automobile. Yet, he could not recall how he delivered the money to Onett. Based on inconsistencies in his testimony, the district court concluded that Scarborough received a portion of the $7,500. Even if Scarborough did not receive a portion of the money, a Hobbs Act prosecution is not defeated simply because the extorter transmitted the extorted monies to a third party. Scarborough nevertheless participated in the scheme to induce Peter Abbott to part with his property. *See United States v. Hyde,* 448 F.2d 815, 843 (5th Cir.), *cert. denied,* 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972) (one need receive no personal benefit to be guilty of extortion).

■ With regard to Scarborough's conviction for soliciting a $1,000 campaign contribution in exchange for his services (Count Five), the conviction is reversed for insufficiency of evidence, as discussed above with respect to the same claim raised by Haimowitz.

Scarborough's third claim is that the trial court erred when it denied a motion for judgment of acquittal for a due process violation caused by what he called "outrageous governmental conduct." According to Scarborough, the Abbott investigation was an undercover operation created entirely by the government, and as such, violated due process guarantees of fundamental fairness. Scarborough contends that the court should consider the special status of a legislator when applying the due process standard.

■ In *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the Supreme Court recognized outrageous governmental conduct as a legal de-

fense. To succeed under this defense, the defendant must show that the challenged governmental conduct violated " 'that fundamental fairness, shocking to the universal sense of justice,' mandated by the due process clause of the fifth amendment." 411 U.S. at 432, 93 S.Ct. at 1643 (*quoting Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 246, 80 S.Ct. 297, 303, 4 L.Ed.2d 268 (1960)). *See also Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *United States v. Tobias,* 662 F.2d 381 (5th Cir.1981), *cert. denied,* 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982). Whether outrageous governmental conduct exists "turns upon the totality of the circumstances with no single factor controlling" and the defense "can only be invoked in the rarest and most outrageous circumstances." *United States v. Tobias,* 662 F.2d at 387. Neither the Supreme Court nor the Fifth nor Eleventh Circuits has ever reversed a case on this ground. *United States v. Sayers,* 698 F.2d 1128, 1130 (11th Cir.1983); *United States v. Gianni,* 678 F.2d 956, 959–60 (11th Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982).

■ We hold that Scarborough has not shown the presence of outrageous governmental conduct. A state senator enjoys no special consideration from the court when it views the totality of the circumstances involving a due process claim. *See United States v. Dean,* 666 F.2d 174 (5th Cir.), *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982). In this case, Scarborough was brought into the scheme by codefendant Haimowitz, not by the government or its agent, Peter Abbott. Nor is this Court persuaded by Scarborough's argument that undercover operations will have a chilling effect on the willingness of public officials to meet with a constituent for fear of being "set up." Any public official approached by a constituent to participate in an illegal scheme can simply say "No."

## IV. ONETT

Defendant Onett makes the following claims on appeal: 1) the trial court erred in

denying his motions for a judgment of acquittal for insufficiency of the evidence; 2) the trial court erred in failing to suppress the results of illegal electronic surveillance; and 3) the trial court erred to the substantial prejudice of Onett when it admitted various statements of alleged coconspirators.[17]

The first issue is whether the trial court erred in denying Onett's motions for a judgment of acquittal. As stated earlier, this Court must examine the evidence in the light most favorable to the government. First, Onett asks that we examine the conspiracy and substantive mail fraud convictions under 18 U.S.C.A. § 1341[18] and 18 U.S.C.A. § 371[19] (Counts One and Nine).

The government was required to prove that Onett participated in the scheme to defraud. *United States v. Hartley,* 678 F.2d 961, 985 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983). On May 1, 1980, Haimowitz first contacted Onett for assistance in obtaining the liquor license. On May 7, 1980, Haimowitz and Onett discussed preparing an amendment to the original license application and Onett advised Haimowitz to complete the amendment to show that Peter Abbott had an "outside interest" by listing Peter Abbott as simply an "accommodation endorser and guarantor," and by indicating that the Small Business Administration note executed by Abbott was to be "with no recourse against the establishment." The amended application containing Onett's suggestions was filed by Haimowitz on May 8, 1980 and was mailed

from Jacksonville to Tallahassee on May 12, 1980. In addition, a "save harmless agreement" was filed with the amended application at Onett's suggestion. Onett maintained a personal copy of the amended application in his file. In late April or early May, Onett told the Beverage Department that he represented Peter Abbott, not Jean Abbott. Notwithstanding the fact that Onett's copy of the license application did not list Peter Abbott as being an officer, director, or shareholder of the corporation, on May 7, 1980 Haimowitz told Onett that he would have to get approval of Onett's fee from Peter Abbott, not Jean Abbott. Onett never had any conversations, in person or by telephone, with Jean Abbott regarding the beverage license application.

Based on those facts, we believe that there was sufficient evidence to support the district court's finding that Onett knew of the contents of the beverage license applications and knew that Abbott's ownership interest was misrepresented. The district court could easily infer that Onett knew that Abbott was more than simply an "accommodation endorser and guarantor."

Events subsequent to the May 12, 1980 mailing also evidence Onett's role in the scheme. A conversation between Abbott and Scarborough on May 24, 1980 indicates that Scarborough and Onett both were knowledgeable of and had discussed the fact that the true applicant for the liquor license was Peter Abbott, whose background they knew disqualified him for a license.[20] Onett nevertheless assured Peter Abbott that he would obtain the license.[21]

---

**17.** Onett also incorporates arguments of his codefendants. Since their convictions were affirmed, we need not reach the issue of whether he has standing to incorporate their arguments.

**18.** *See supra* footnote 6 for text of § 1341.

**19.** *See supra* footnote 7 for text of § 371.

**20.** On May 24, 1980, Scarborough reported to Abbott that Onett had read the entire application, and when asked what Onett had said, Scarborough responded as follows:
Scarborough: He [Onett] said the man's in business. So what do you care, so [expletive

deleted] up. He said but I gotta know. But you don't want too many people, you understand what I'm saying. He said, the guy's got something going, but [expletive deleted] it, that's no problem, we can still get the license.

**21.** On July 17, 1980, Abbott and Onett had the following conversation:
Abbott: I just want my license.
Onett: That's the, that's the only reason I'm here, this is our relationship.
Abbott: That's all I want.
Onett: To get the damn thing processed.

On July 17, 1980, Onett and Scarborough held a discussion in which they noted that because Peter Abbott was a convicted felon, they were placing Peter Abbott's assets in Jean's name. Onett was also present when Scarborough introduced Peter Abbott as the owner of the restaurant. On March 30, 1981, Onett testified to the grand jury that it was clear to him on July 17, 1980 when he visited the restaurant that Peter Abbott was "running the whole show." He also testified that he had never met Jean Abbott. Yet on July 28, 1980, Onett advised Abbott that he had told the Beverage Department that he had visited with Abbott and his wife and spent time at the restaurant. He had further advised the Beverage Department that Abbott was going to run a legitimate place. Thus, Onett continued to fraudulently and affirmatively misrepresent to beverage officials the true status of Abbott's involvement in the restaurant after a point in time at which Onett admits knowing the true status of the operation of the restaurant. Moreover, before the grand jury, Onett testified that he understood the Florida statutory requirements of disclosure in liquor license applications.

■ The government was also required to prove that the mails were used and that the defendant used or caused the use of the mails. *United States v. Hartley*, 678 F.2d at 985. Here, the mails were used when the applications were mailed from the Jacksonville office of the Beverage Department to the Tallahassee office. Like Haimowitz, Onett "caused" the mails to be used for he was aware that the liquor license applications would be transmitted by mail between the two offices. *See Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954).

■ Thus, Onett conspired with Haimowitz and Scarborough to defraud and to unlawfully obtain property in violation of 18 U.S.C.A. § 371. Having conspired in the scheme, he unlawfully and willfully caused the liquor license application to be sent and delivered by the United States Postal Service in violation of 18 U.S.C.A. § 1341. Therefore, we hold that there was sufficient evidence to sustain Onett's conspiracy and substantive mail fraud convictions.

Onett also argues that he should have been acquitted of the conspiratorial and substantive extortion charges under 18 U.S.C.A. § 1951 [22] (Counts Two and Four). Onett contends that since Abbott was a member of the alleged conspiracy, Abbott could not at the same time be the victim of the extortion conspiracy. As noted in our discussion of Haimowitz's claims, however, the threat of failing to obtain a liquor license was reasonably calculated to instill fear of economic loss in Abbott. We hold that there was sufficient evidence to prove Onett's role in the extortion scheme. We also hold that, as we stated with respect to Haimowitz, extortion "under color of official right" was proved, and the effect on commerce required by the Hobbs Act was shown.

Second, Onett contends that the district court's finding of guilt with respect to the perjury counts requires reversal. Counts Eighteen and Nineteen allege that Onett, while a witness and under oath before a federal grand jury, knowingly and willfully made false and material declarations. Specifically, under Count Eighteen, Onett testified that he did not discuss with Peter Abbott: 1) that there might be news clippings out about Abbott; 2) that Onett was going to get a copy of those news clippings from Kenneth Ball; and 3) that Onett had information from a newspaper article and otherwise that Abbott was an informer for the FBI.[23] The Count alleges that such testimony was false because on or about

Abbott: When my license comes, pay you the money.
Onett: Right, that's our deal.

**22.** *See supra* note 11 for the text of § 1951.

**23.** Onett's grand jury testimony was as follows:
Q. Did you discuss with Mr. Abbott himself the fact that there might be news clippings out about him?

July 17, 1980, Onett was videotaped discussing the three subjects with Abbott.[24] Under Count Nineteen, Onett testified to the grand jury that while in the office at Abbott's Restaurant, Jacksonville, Florida, on or about July 17, 1980, he told Peter Abbott that he wanted to meet Peter Abbott's wife and was insistent that he meet her.[25] The Count alleges that a videotape made of the conversations proves that such testimony was false.[26]

 Three elements are essential to prove a perjury charge: 1) that defendant in fact made the particular statements to the court proceeding; 2) that defendant knew the statements to be false when they were made; and 3) that the statements

---

A. No, sir.
Q. You never did at all?
A. No, sir.
Q. Did you ever tell Mr. Abbott that you were going to get copies of those news clippings from Kenneth Ball?
A. No, sir.
Q. You never told Mr. Abbott that you had information from a newspaper article or otherwise, that he was an informer for the FBI?
A. No, sir. No, sir . . . .

24. Pertinent portions of the videotaped conversation are quoted below:

Onett: . . . Ah, he [Haimowitz] heard about this newspaper article out of Alabama. Okay, that shook the [expletive deleted] out of him. I says, hey, I don't care what the guy does. Don't you know, have you seen the article?
Abbott: No.
Onett: Oh, they had you as an informer for the FBI and, uh . . .
Abbott: Have you seen the article?
Onett: Uh, they have in Tallahassee.
Abbott: Have you gotten to see it?
Onett: No, that Kenny Ball's gonna show it to me when I go up next week.
Abbott: I've never seen the article. As far as I know, I was never there.
Onett: Might be another Peter Abbott. Sure sounds like you (laughing) with the background. Massachusetts and the whole thing.
 * * * * * *
Abbott: Have you talked to them about that, that Alabama thing or have you, have you . . .
Onett: All they did was tell me that they had a newspaper article from Alabama.
 * * * * * *
Onett: . . . Tell ya, I'll ge, get that newspaper article and get you a copy of it.
Abbott: Can you get me a copy of it?
Onett: Oh, [expletive deleted], I'll make 'em give me a copy.
Abbott: Will he give us one?
Onett: Sure, if they're gonna throw it in my kisser, I'm gonna say I wanna copy of it.
Abbott: Has he thrown it in your kisser yet?
Onett: Well, he said he wants me to see it.
 * * * * * *
Abbott: Let me ask you a question. When did Ball tell you that I, there was something from Alabama?

Onett: About a week ago. Said they got a newspaper article I want you to see on your, on your client. I said what client. He said Peter Abbott. I said I don't represent Peter Abbott, you dumb [expletive deleted], I represent his wife. And he says, well, I thought you might be interested in seeing it. I said hold it, I'll see it when I get to Tallahassee.

25. Onett's grand jury testimony was as follows:

Q. Did you go to the restaurant?
A. Yes.
Q. Did you meet Jean Abbott?
A. She was not there.
Q. Who did you meet?
A. I met Mr. Abbott.
Q. Where did you meet with him?
A. He came over to the table. After dinner he showed me around, then he said he wanted to talk to me and he took me into his office.
Q. Okay, and that appeared to you to be in his office during your discussions with him?
A. Yeah, I says, "Where is your wife?" He says, "Well, she's very sorry but she had some problems and she couldn't come here tonight." So I says, "Well, I really came up here to meet her, I want to meet her." And I says—
Q. Where did you tell him this?
A. Sitting in his little cubicle of an office, a very small office.
Q. In his office?
A. Yes, just the two of us were there. He was sitting behind the desk.
Q. And, you told him then that you wanted to meet with his wife?
A. Yes. My whole intentions were to meet with his wife and he sloughed it off like it wasn't important, she just couldn't be there.
 * * * * * *
Q. And, at that meeting were you insistent that you should be able to meet with her?
A. Yes.

26. A review of the transcript of the taped conversation reveals that Onett never asked to see Jean Abbott.

were material to the grand jury or other court proceeding's investigation. 18 U.S. C.A. § 1623; *United States v. Cosby,* 601 F.2d 754, 756 (5th Cir.1979). Onett contends that the questions posed by the prosecutor leading to Counts Eighteen and Nineteen were sufficiently vague as to prevent the finder of fact from concluding beyond a reasonable doubt that Onett knowingly answered falsely.[27] We recognize that "[t]he burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry." *Bronston v. United States,* 409 U.S. 352, 360, 93 S.Ct. 595, 601, 34 L.Ed.2d 568 (1973). Nevertheless, we believe that the quoted passages from Onett's testimony, when compared to his actual statements on tape, show that the prosecutor's questions were sufficiently precise and that Onett's answers were not literally true.[28] *See United States v. Crippen,* 570 F.2d 535, 537–38 (5th Cir.1978), *cert. denied,* 439 U.S. 1069, 99 S.Ct. 837, 59 L.Ed.2d 34 (1979). Thus, we affirm the perjury convictions on Counts Eighteen and Nineteen. *Compare Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973) (perjury conviction reversed where answer literally true but unresponsive); *United States v. Brumley,* 560 F.2d 1268 (5th Cir. 1977) (perjury conviction failed for lack of specificity, for lack of critical question, and for lack of an unequivocal answer).

Onett's third claim is that the district court erred in failing to suppress the results of electronic surveillance, which was conducted in violation of the fourth amendment. The electronic surveillance consisted of visual and aural recordings made of various meetings and telephone conversations. Peter Abbott gave the FBI blanket permission to record his conversations with defendants and he was a party to all of the taped conversations. The FBI supervised the recordings, although Abbott had full control over the switch that turned the recorders on and off. Abbott had no other access to the recording equipment and steps were taken to insure that Abbott could not tamper with the tapes. After a recording, an agent would retrieve the tape. Abbott failed to record one conversation with Haimowitz that the FBI requested he record.

Under 18 U.S.C.A. § 2511(1), the interception of oral or wire communications is prohibited and is a criminal offense, except as governed by specific exceptions to that statute. Under 18 U.S.C.A. § 2515, the use as evidence of a communication which does not come within one of the exceptions is prohibited. In this case, the government relied on one of the exceptions, described in 18 U.S.C.A. § 2511(2)(c), to overcome the prohibition:

(c) It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

Onett raises two issues: 1) whether Abbott was acting "under color of law" within the meaning of section 2511(2)(c); and 2) even if Abbott was acting "under color of law,"

---

**27.** With regard to Count Eighteen, Onett argues that he truthfully testified that he did not discuss with Abbott that there *might* be newsclippings about Abbott because on the videotape, he unequivocally stated that Abbott *was* in the article. The "might" referred to the fact that the article might refer to a different Peter Abbott. Onett also claims that he truthfully told the prosecutor that he was not going to *get* copies of those news clippings because on the videotape, Onett said he was going to *see* copies of the articles.

With regard to Count Nineteen, Onett contends that the word "insistent," which the

prosecutor used in a question to Onett, was vague. Onett also contends that he could have asked to see Mrs. Abbott while he was entering the room and the video recording machine was turned off.

**28.** Onett also claims that at the time the July 17, 1980 conversation was videotaped, Onett was intoxicated, thus suggesting that his ability to recall events was adversely affected. The district court judge, however, who saw the tape, found that Onett's demeanor on tape was not that of an intoxicated person.

whether such warrantless electronic interceptions are proscribed by the fourth amendment.

 Onett argues that Abbott did not act "under color of law" within the meaning of section 2511(2)(c) because Abbott recorded conversations outside the presence of government agents and with control over the on and off switch to the equipment. Courts have established that informants who record private conversations at the direction of government investigators are "acting under color of law." *See e.g., United States v. Shields,* 675 F.2d 1152, 1156–57 (11th Cir.), *cert. denied,* 459 U.S. 858, 103 S.Ct. 130, 74 L.Ed.2d 112 (1982); *United States v. Shedan,* 651 F.2d 336, 337 (5th Cir.1981). Thus, the question in this case is whether Abbott was acting at the direction of the government when he recorded the conversations. In *United States v. Shields,* 675 F.2d 1152, the defendant hired a private detective to help him tape conversations between his codefendant and him. The private detective went to the FBI, and the FBI provided the detective with recording equipment. The defendant wore the recorder, and the detective, not the FBI, controlled the recording equipment. Nevertheless, the court held that the private detective was acting under color of law when he recorded the conversations. *See also United States v. Salisbury,* 662 F.2d 738 (11th Cir.1981), *cert. denied,* 457 U.S. 1107, 102 S.Ct. 2907, 73 L.Ed.2d 1316 (1982) (defendant did not dispute that informant acted under color of law when informant received and recorded telephone calls); *United States v. Tousant,* 619 F.2d 810 (9th Cir.1980) (informant who was apparently operating the recording equipment was acting under color of law); *United States v. Rich,* 518 F.2d 980 (8th Cir.1975), *cert. denied,* 427 U.S. 907, 96 S.Ct. 3193, 49 L.Ed.2d 1200 (1976) (informant acted under color of law when he recorded a call outside the presence of federal agents). Therefore, although the FBI was not present when Abbott recorded conversations, Abbott was still acting under color of law. As such, the recordings were properly made under 18 U.S.C.A. § 2511(2)(c), and under 18 U.S.C.A. § 2517, the conversations could be disclosed to the grand jury.

 Onett's argument that such warrantless electronic interceptions are proscribed by the fourth amendment is without merit. An individual has no legitimate expectation that the person to whom he is speaking will not relate the conversation to the legal authorities, either by repetition or by the recording of the conversation. *See United States v. CaCeres,* 440 U.S. 741, 750–51, 99 S.Ct. 1465, 1470–71, 59 L.Ed.2d 733 (1979); *United States v. White,* 401 U.S. 745, 749–51, 91 S.Ct. 1122, 1124–25, 28 L.Ed.2d 453 (1971) (plurality opinion); *United States v. Davanzo,* 699 F.2d 1097, 1100 (11th Cir.1983); *United States v. Salisbury,* 662 F.2d 738, 740 (11th Cir.1981), *cert. denied,* 457 U.S. 1107, 102 S.Ct. 2907, 73 L.Ed.2d 1316 (1982).

 Lastly, Onett claims that the district court admitted various statements of alleged coconspirators in violation of Rule 801(d)(2)(E) of the Federal Rules of Evidence. According to Onett, the declarations by his alleged coconspirators should not have been admitted in evidence at trial because the government failed to prove by independent evidence that Onett participated in the conspiracy and failed to prove that the declarations were in furtherance of the conspiracy. *See United States v. James,* 590 F.2d 575, 578 (5th Cir.), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). The district court's finding is a factual determination that is reversible only if shown to have been clearly erroneous. *United States v. Hawkins,* 661 F.2d 436, 450 (5th Cir.1981), *cert. denied,* 457 U.S. 1137, 102 S.Ct. 2967, 73 L.Ed.2d 1355 (1982). Upon review of the record, we cannot say that the court clearly erred in admitting the statements.

## V. CONCLUSION

We AFFIRM defendants' convictions on each Count on which they were found guilty in the district court, with the exception of the convictions of Haimowitz and Scarborough on Count Five, which we REVERSE.